Paul A. GORIN, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

Henry GRILLO, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

Saul GLASSMAN, Defendant, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 5997–5999.

United States Court of Appeals
First Circuit.

Feb. 20, 1963.

Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, Boston, Mass., was on brief, for Paul A. Gorin, appellant.

Manuel Katz, Boston, Mass., with whom Paul T. Smith, Boston, Mass., was on brief, for Henry Grillo, appellant.

James D. St. Clair, Boston, Mass., with whom Blair L. Perry and Hale & Dorr, Boston, Mass., were on brief, for Saul Glassman, appellant.

John J. Curtin, Jr., Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., William F. Looney, Jr., and Paul A. M. Hunt, Asst. U. S. Attys., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

These three appellants and one Nathaniel Bergman of Hartford, Connecticut, were indicted by a grand jury in the court below on three counts. Count 1 charges the three appellants and Bergman with conspiring (1) to bribe one Charles J. McCaffrey, an employee of the Internal Revenue Service of the United States Department of the Treasury, and (2) to defraud the United States in its governmental functions by depriving it of McCaffrey's conscientious, honest and faithful service in violation of Title 18 U.S.C. § 371. Count 2 charges Bergman and the appellants Glassman and Gorin with giving McCaffrey $10,000 with intent to influence his decision and action on a matter at the time pending before him in his official capacity, in short with bribery, in violation of Title 18 U.S.C. § 201. Count 3 describes Grillo as a United States officer acting in connection with the revenue laws of the United States and charges him alone with conspiring with the other three, who were named as co-conspirators but not as co-defendants, to defraud the United States in its governmental functions in violation of Title 26 U.S.C. § 7214(a) (4).

Following the denial of a number of preliminary motions to be discussed presently, the four defendants were tried by jury on pleas of not guilty, were found guilty as charged and were sentenced. All appealed, but Bergman withdrew his appeal before hearing.

Before the trial began each defendant moved to dismiss the indictment and to strike the entire panel of petit jurors on the ground that both the grand and petit jurors had been improperly selected. The motions were denied after a hearing at which evidence was taken.

The evidence adduced shows that the jury commissioners of the United States District Court for the District of Massachusetts selected persons for service as jurors from the jury lists of the various cities and towns in Massachusetts, that the City of Boston was within the part of the district designated by the district court under Title 28 U.S.C. § 1865(a) as the source from which the jurors with whom we are here concerned were drawn, and that the Boston Election Commission, the body charged by local law with the annual preparation of jury lists for the City of Boston, picked jurors at random from the lists of registered voters in the various wards of the city and then, by reference to the list of inhabitants prepared annually by the city police department, weeded out those exempt by law because of their occupations, such as clergymen, lawyers or doctors, and following this by personal interviews weeded out those physically or mentally unfit for jury service and those with an inadequate command of the English language. The contention is that the jury commissioners' method of selection, resting as it does in part upon the method of selection used in Boston by the Boston Election Commission (it does not appear

whether the same method of selection was used by local authorities in the other cities and towns of the part of the district involved), violates § 1861 of Title 28 U.S.C. quoted in material part in the margin [1] because it automatically excludes citizens who are not registered to vote. The argument is that eligible voters who have not registered constitute a definite group or class in the community, that is to say, an apolitical or politically dormant group, and that exclusion of that class or group from jury service results in juries which do not represent "a cross-section of the community" as required, so it is said, by Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S. Ct. 984, 985, 986, 90 L.Ed. 1181 (1946).

■ The argument rests upon too literal a reading of the phrase quoted above, for it has never been the law that a jury must represent a true cross-section of the community. See Report of the Committee on the Operation of the Jury System to the Judicial Conference of the United States, September 1962 at page 6. Certain groups, as by §§ 1862 and 1863 of Title 28 U.S.C., are and time out of mind have been exempted from jury duty, some for the general public interest, such as public officials or members of the armed forces, and others, such as convicted felons, minors and persons unable to understand the English language, for the effective operation of the jury system. And the Court in the Thiel case clearly recognized the established practice of exempting certain persons from jury service by explaining that what it meant by the sentence wherein it used the phrase "a cross-section of the community" was only that prospective jurors must be selected by court officials without systematic and intentional exclusion of any economic, social, religious, racial, political or geographical group in the community.

For a variety of reasons we reject the argument that eligible persons who do not register to vote constitute a "political" group in the community. In the first place the group does not include only the politically inert. It includes also the politically alert who may perhaps have lived for a year or more in the district but not long enough in their ward to be eligible to register to vote. In the second place, the group has no distinct or definable outlines, for in addition to persons who have just moved into a ward, it includes not only the completely apathetic but also those who might register to vote only when interested in a particular election. It includes persons of varying shades of political interest. And in the third place we think the Court in referring to a political group in the Thiel case meant the members of some defined political party or group.

■ This does not mean blanket endorsement of jury selection directly or indirectly from voting lists. It means that voting lists may be used as the basis for jury selection unless it appears that in the community there is systematic and intentional exclusion from those lists of a particular economic, social, religious, racial, geographical or political group. When such a showing is made some other basis of selection must be used. Here, however, the appellants have not shown that in Boston any enumerated class is systematically and intentionally discriminated against in registering to vote. Indeed the evidence is quite to the contrary. The appellants' contention fails for lack of any evidence of discrimination in the preparation of the lists of Boston voters. Compare United States v. Hoffa, 196 F.Supp. 25 (S.D.Fla., 1961), with United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y., 1961).

■ Also before trial the appellants severally moved to dismiss the indictment because it had been returned by grand jurors calculatedly prejudiced against them by government-inspired

---

1. "Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror * * *."

publicity. We think the court below very properly denied the motions.

The appellants characterize the publicity of which they complain as "massive," and describe it as "blanketing" the Commonwealth of Massachusetts. It boils down, however, to news releases printed in local newspapers and repeated in substance over radio and television on August 26, 1961, the day two of the appellants and Bergman were arrested, and for the next two days, purporting to quote the Attorney General as extolling the vigor, skill and integrity of the Internal Revenue Service and as saying that the Charles J. McCaffrey mentioned in the indictment had reported Glassman's offer to bribe him to his superiors and upon their instructions had pretended to go along with the plan and "is a courageous American and typifies the loyalty and integrity of the men of the Internal Revenue Service."

The appellants admit that their contention "presupposes" that there is either a right under the Fifth Amendment of the Constitution of the United States to be indicted by grand jurors free of calculated government-instigated prejudice or else that proper standards for enforcement of the criminal law in the federal courts sanction only indictment by a grand jury uninfluenced by improper forces generated by the prosecutor. They must also "presuppose" that they do not need to show that in fact the grand jury which indicted them did not perform its sworn duty to act with impartiality but instead was actuated by government-inspired bias and prejudice. We are not prepared to grant these "presuppositions." So far as we are aware, none has the sanction of any decision of the Supreme Court of the United States and all have been rejected in one or another carefully considered opinion of a lower federal court. See United States v. Nunan, 236 F.2d 576, 592 et seq. (C.A.2, 1956), cert. den. 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); Beck v. United States, 298 F.2d 622 (C.A.9, 1962), cert. den., 370 U.S.

919, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962); United States v. Dioguardi, 20 F.R.D. 33 (S.D.N.Y., 1956); United States v. Hoffa, 205 F.Supp. 710 (S.D.Fla., 1962). But even if we should accept the "presuppositions," which we by no means imply, we would still reject the appellants' contention.

We do not approve of pretrial publicity, particularly when it emanates from prosecuting officials. In the interest of fair trial it is better avoided. But the publicity here complained of was minor. It was not continuous but was pretty much a single-shot affair. And although it related to serious crimes involving corruption of public officials, it did not relate to a spectacular crime likely to arouse strong public emotion, excitement or passion such as murder or rape. Nor did the publicity vilify or heap opprobrium on the appellants. It only endorsed the character, and thereby inferentially the credibility, of the government's principal witness. We do not think the publicity complained of was serious enough to warrant the drastic remedy of dismissing the indictment, if, indeed, that remedy is available at all.

Pretrial motions for severance were also made and denied and similar motions were repeated intermittently throughout the trial but in every instance denied.

Clearly joinder of the defendants in the indictment was proper under Criminal Rule 8(b). To obtain severance it was, therefore, incumbent on the appellants to make such a strong showing of prejudice as to invoke the discretionary remedy provided in Criminal Rule 14 entitled "Relief from Prejudicial Joinder." This the appellants have undertaken to do for a variety of reasons.

Glassman and Grillo argue for severance for the reason that the testimony of co-defendants is essential to their defense and, they say, it is not available to them unless each defendant is tried separately so that they can put co-defendants on the stand. The argument is unrealistic. There is no reason

to think that a co-defendant would be any more willing to waive his constitutional privilege against self-incrimination when called as a witness at a separate trial than he would be willing not to insist upon his privilege as a defendant not to take the stand. Moreover, in Olmstead v. United States, 19 F.2d 842, 847–848, 53 A.L.R. 1472 (C.A.9, 1927), affirmed as to other matters 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), it was held that the inability of a defendant in a conspiracy case to use the testimony of co-defendants in his defense is not enough to show abuse of discretion in refusing a motion for severance.

■ Another argument for severance was particularly emphasized by counsel for Grillo in the court below. It deserves mention since it applies to some extent to all appellants and was advanced for all in this court. Grillo's argument below was that at the trial he would be confronted with so much testimony of so many acts and statements of other defendants not in his presence and without his authorization or knowledge that in spite of limiting instructions [2] the jury could not possibly overcome the prejudicial effect of the testimony or consider his case on its own individual merits.

■ Grillo's fear is not unfounded. See the late Mr. Justice Jackson's concurring opinion in Krulewitch v. United States, 336 U.S. 440, 445, particularly at 453, 69 S.Ct. 716, 719, 723, 93 L.Ed. 790 (1949). But no case has been cited to us and we are not aware of any holding that it was an abuse of discretion not to grant severance for the reason advanced. While the potentiality of prejudice certainly exists, it is far greater when the number of conspirators involved is large. The prejudice asserted in this case seems pale indeed when compared with the prejudice involved when fifty-nine conspirators were tried without severance in Capriola v. United

States, 61 F.2d 5, 11 (C.A.7, 1932), cert. den. Walsh v. United States, 287 U.S. 671, 53 S.Ct. 315, 77 L.Ed. 579 (1933), or seventy-five in Allen v. United States, 4 F.2d 688, 698–699 (C.A.7, 1925). It is well established that the granting of a motion for severance lies in the discretion of the trial judge. Stilson v. United States, 250 U.S. 583, 585–586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). In the absence of a far stronger showing than is made in this case we would not be warranted in finding that discretion had been abused.

■ Our function as an appellate court is to examine the record with care to make sure that the trial court minimized possible prejudice. This we have done, and from a reading of the record it seems obvious to us that the trial judge went to no little pains to give appropriate limiting instructions at the outset of the trial, throughout its course, and finally and at length in his charge, which counsel for Grillo admits in his brief, was "literally correct on this point." We do not believe that it was incumbent on the court below to interrupt the trial with limiting instructions every time the name of an absent co-conspirator was incriminatingly mentioned. In this four-defendant conspiracy case we can repeat what Circuit Judge Hincks said in the eighteen-defendant case of United States v. Stromberg, 268 F.2d 256, 265 (C.A.2, 1959), cert. den. Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959), that is to say: "* * * we think it by no means a task of insuperable difficulty for the jury to comply with the judge's instructions and determine as to each defendant the issue of membership in a single continuing conspiracy on the basis of the independent evidence—i. e., the evidence as to his own acts and admissions."

We come now to the trial itself.

■ At its outset in accordance with the practice sanctioned by Criminal Rule

2. That is to say, instruction that such testimony is not admissible as against Grillo until the government has first established

not only the existence of a conspiracy but also Grillo's membership in it.

24(a) the *voir dire* examination for prospective jurors was conducted not by counsel but by the court. The appellants do not challenge the practice. And they concede that a trial judge undoubtedly has "a broad discretion as to the questions to be asked" of prospective jurors, subject only "to the essential demands of fairness." Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931).[3] Their contention is that the "essential demands of fairness" required the trial judge to ask prospective jurors a variety of specific questions to determine possible bias or prejudice, such as whether they had any prejudice against lawyers or against persons "with income tax problems," whether they would think someone guilty because he had been charged with crime and arrested, whether they would give more credence to a government agent than to a lay witness and whether they would have any prejudice against a client because his counsel objected to the admission of evidence. We see no abuse of discretion in failing to put these questions to prospective jurors. As to these matters the court's general questions coupled with its charge afforded the appellants ample protection.

■ Particularly, however, the appellants object to the refusal of the court to ask prospective jurors specifically whether they had read or heard of the statement attributed to the Attorney General with respect to the integrity and courage of Charles J. McCaffrey discussed hereinabove, and, if they had, whether the statement would affect their judgment in passing upon McCaffrey's credibility as a witness. The questions were not impertinent. But the court below may well have felt that putting the specific question would call the publicity to mind and perhaps do appellants more harm than good. Under the circumstances of this case, particularly the "one-shot" nature of the publicity, we think the court gave the appellants adequate

protection when it allowed jurors to sit upon receiving a "No" answer to the question: "Are any of the jurors familiar with the facts of this case, either personally or through the press, radio, or television or any other means?"

We come now to consideration of the facts adduced at the trial.

■ Nathaniel Bergman was an attorney-at-law practicing in Hartford, Connecticut. In 1959 a special agent attached to the Hartford District Office of the Internal Revenue Service, IRS hereinafter, began an investigation of Bergman's income tax returns for preceding years. Bergman retained local counsel and in February, 1961, he also retained the appellant Paul Gorin, who was a lawyer practicing in Boston in the field of federal taxation. On May 1, 1961, the Intelligence Division of the Boston Regional Office received the special agent's report of his examination of Bergman's tax returns recommending criminal prosecution of Bergman and his wife for tax evasion. Regional Intelligence agreed with this recommendation and forwarded the case to the Enforcement Branch of the Boston Regional Counsel's office, wherein lay the duty on review to recommend for or against criminal prosecution in federal tax cases arising in the area.

The head of the Enforcement Branch at this time was the Charles J. McCaffrey to whom we have referred. He had come to Boston from similar duty in San Francisco in July 1959 and by April 1960 had met the appellant Glassman, who was a lawyer in the general practice in Boston specializing "more or less" in the law of real property. Both were retired officers of the United States Marine Corps and they first met at an organizational meeting of a Marine Corps Reserve voluntary training unit (hereinafter VTU) consisting of reserve officers who were lawyers. Glassman was the commanding officer of the unit; McCaffrey was the training officer and next in command. Their relationship became cordial.

---

3. In this case there is no question of racial prejudice, as in Aldridge, or as in Frasier v. United States, 267 F.2d 62, 66 (C.A.1, 1959).

At this point the testimony diverges rather sharply. Glassman, who took the stand in his own defense, testified that on several occasions prior to the end of May 1961 when he and McCaffrey met socially, or at VTU meetings, or to plan the training program for the unit, they discussed the general nature of each other's work and McCaffrey urged him to take some courses and develop a tax practice, saying that the field was lucrative. Glassman said that he replied: "My practice just hasn't tended toward that," to which Mc-Caffrey answered: "Well, just remember if you ever do hit a case you've got a good friend up there." Glassman also testified that when he and McCaffrey met at a social function in March 1961 McCaffrey expressed envy when he learned that Glassman was about to go to Europe, said that he wished he and his wife could do the same and commented: "You can't save any money when you're working for the government and have a big family." And Glassman testified that on May 26, 1961, when he met with McCaffrey to discuss the quarterly training schedule for the VTU McCaffrey again recommended a tax practice as profitable and said: "You know Paul Gorin, don't you?" Glassman said that he answered that he knew Gorin casually, to which he said McCaffrey replied: "He is certainly doing all right for himself. Saul, you should be doing some of that tax work. I am really in a position to help you out. Why don't you see Gorin and tell him you have got a good friend up at Enforcement. I think you can do yourself a lot of good."

McCaffrey agreed that prior to the end of May 1961 he and Glassman had discussed each other's professional work, in the course of which he had learned that Glassman was primarily a real estate lawyer. Furthermore, McCaffrey admitted that he knew that Glassman did not have a Treasury card that entitled him to represent clients before official bodies in the Treasury Department on tax matters, and he also admitted that he had recommended a tax practice to Glassman as profitable and had suggested that Glassman take some tax courses and enter that field. McCaffrey, however, categorically denied making the other remarks attributed to him by Glassman.

We turn now to the critical period of the alleged conpiracy, which began during the last days of May 1961. Glassman testified that he had known Paul Gorin for over ten years and that they were on a first name basis. He said that he happened to meet Gorin casually on May 27 and asked him if he had a tax fraud case that was going to prosecution. Glassman said that Gorin answered: "Yes. What do you know about it?" to which Glassman said he replied: "Nothing, but if you need any help I've got a good friend up in Enforcement I could talk to." Arrangements were then made to discuss the matter further the following week and by appointment they met again on May 31. At that time, according to Glassman, Gorin identified the case he had referred to as a net worth case involving Nathaniel Bergman of Hartford, Connecticut, and asked Glassman if he thought he could "do anything." Glassman said he replied that he did not know but that he had "a good friend up in Enforcement" and that he would speak to his "friend" and "see what he has to say." Gorin asked: "When?" and Glassman replied: "I don't know. As soon as I can. I will call you."

McCaffrey and Glassman agree that Glassman did indeed telephone to McCaffrey on May 31. However, their versions of the telephone conversation differ. Glassman said that he told McCaffrey that he wanted to talk about the Bergman case and that McCaffrey replied that the case had been assigned to one of the men in his office but he would look into it and call Glassman. McCaffrey testified that in that telephone conversation Glassman said he wanted to talk about a case but did not identify it, and that the request made him "uneasy" because he knew that Glassman had no power of attorney in any case in his office and therefore had "no right to talk to me about any case." McCaffrey also said that because of his "uneasiness" he did not attend a VTU meeting that night and immediately re-

ported the telephone conversation to a senior attorney in Regional Counsel's office whom he asked to make a memorandum of his disclosure "just in case something happened."

On the next day, June 1, Glassman telephoned McCaffrey again [4] and in that conversation, according to McCaffrey, for the first time identified the Bergman case as the one in which he was interested. Both agreed that later in the day Glassman went to McCaffrey's office. Their version of what there transpired differs. Glassman testified that McCaffrey greeted him with the remark: "Well Saul, I see that you've talked to friend Gorin," and then proceeded to disclose facts and figures of the Bergman case to show that it would be prosecuted on a net worth basis and that it involved a very substantial sum in deficiencies. Glassman said that he asked McCaffrey: "Look, Mac, is this a case I should get involved in? Do you have to recommend prosecution or is this a case that can go either way?" to which he said McCaffrey replied that from what he knew of the Bergman case there had been other cases coming from Connecticut "that looked much worse and we recommended no prosecution." Glassman testified that he told McCaffrey that from the figures disclosed "this looks like a case where I can get a substantial fee if I can do Bergman some good," and that both agreed that they would look into the case further to "see how it shapes up." Glassman also testified that McCaffrey admitted that he ought not to be talking about the case because Glassman had no power of attorney and that when he asked if he should obtain one McCaffrey replied: "If anything develops you can work through Gorin. I know I can always talk to you as a friend."

McCaffrey agreed that he discussed the Bergman case face to face with Glassman on June 1. And he admitted that at the meeting he gave Glassman the amount of civil deficiencies involved in the case and that in doing so he violated the Regulations because Glassman had no power of attorney. Furthermore, he admitted that he would not have discussed the case with Glassman had he been a stranger. But he denied making the remarks attributed to him by Glassman and he said that Glassman in the course of the meeting dropped the remark that in view of the sums involved "there should be enough of a fee in it for all of us." McCaffrey said he replied noncommittally to this remark and that as they parted Glassman said: "I will contact you before I set my fee in this matter."

McCaffrey testified that these remarks so aroused his suspicions that he immediately reported them to his superior officer, the Regional Counsel, saying that he thought Glassman might be intending to offer him a bribe, and that the Regional Counsel because of the doubtful meaning of Glassman's remarks agreed to let McCaffrey handle the matter in his own way. Although McCaffrey's report to his superior should have been in writing, his conduct was otherwise in accord with the Internal Revenue Manual which requires an IRS employee when approached with an offer of a bribe to make such reply as will hold the matter in abeyance and immediately make a full report in writing to a superior.

Meetings and telephone conversations followed between Glassman and Gorin, Gorin and Bergman, Glassman, Gorin and Bergman and Glassman and McCaffrey which do not need to be described in detail. It will suffice to say that on the evidence it might well be found that in the course of them Glassman convinced Gorin and Bergman that he indeed had a friend "up in Enforcement" and that Bergman, Glassman and Gorin were not averse to offering that "friend" a bribe to "kill" the case against Bergman. And there is evidence of remarks made during the first half of June by Glassman to McCaffrey not too subtly hinting that

---

4. This is McCaffrey's version. Glassman testified that McCaffrey called him, said that he had the Bergman files on his desk and that Glassman could come over "anytime."

a bribe might be forthcoming if McCaffrey would recommend against prosecuting Bergman for tax evasion, to which, according to Glassman, McCaffrey lent definite encouragement.

At any rate on June 15 McCaffrey reported to his superior that he thought Glassman had bribery in mind and also made the same report to the Inspection Service, the internal police force of the IRS charged among other matters with the duty of investigating bribery of IRS employees, which at once sent an inspector to Boston from New York to handle the case. The inspector told McCaffrey under no circumstances to initiate a contact but to "go along" with the persons involved, to meet them whenever they chose and to give them any document they wanted. And he also installed an array of electronic equipment in McCaffrey's office, in his car and at times on McCaffrey himself, whereby conversations in McCaffrey's presence could be recorded. After June 20, all McCaffrey's conversations with Glassman, Gorin and Bergman were electronically recorded with the exception of two telephone calls from McCaffrey to Glassman, one on July 7, and another on July 10, and a conversation on July 27 between Gorin and McCaffrey on a golf course. Other telephone conversations were recorded only on McCaffrey's side. These recordings were introduced into evidence and portions of them were played to the jury.

Further meetings between two or more of the four, McCaffrey, Glassman, Gorin and Bergman, followed, which there is no need to recount in detail. It will suffice to say that the upshot of the meetings was that on June 27 Glassman gave McCaffrey $5,000 in bills in return for a rough draft of a criminal action memorandum, known as a CAM, recommending against prosecution of Bergman for tax evasion, and that on June 28 Glassman gave McCaffrey a like amount in exchange for a finished draft of the document. There is ample evidence that Glassman obtained the money from Gorin who in turn had obtained it from Bergman, and that all well knew the purpose for which the money was to be used. Glassman admitted on the stand that the money was paid to McCaffrey as a bribe.

To state the facts in greater detail would expand this opinion inordinately. Although we might go into far greater detail, we think we have stated enough to show that there was evidence from which the jury could properly find that Glassman, Gorin and Bergman had engaged in the conspiracy charged in the first count of the indictment and had given McCaffrey a bribe as charged in the second count. We also think that we have recounted enough to show a factual basis for the defense, Glassman's sole defense, of entrapment.[5]

We turn now to the case against Grillo.

Grillo was the Executive Assistant to the Assistant Regional Commissioner, Intelligence, for the Boston Region. As such he was second in command of the IRS unit to which McCaffrey as head of the Enforcement Branch of the Regional Counsel's Office submitted his recommendations against prosecutions for tax evasion. Although Grillo's duties were primarily administrative he assumed the duties of his superior, the Assistant Regional Commissioner, when the latter was not in his office, one of whose duties was to pass upon recommendations against the criminal prosecution of tax evaders.

There is ample evidence of remarks made by Glassman and Gorin, but not in Grillo's presence, to tie him into the conspiracy. For instance, there is evidence that on the afternoon of June 27 when McCaffrey went to Glassman's office to deliver the rough draft of his recommendation against prosecuting Bergman

---

5. We reject the government's contention that there was no adequate evidence from which the jury could find that Gorin and Glassman had been entrapped and we also reject the latter's contention that the evidence shows entrapment as a matter of law.

criminally, Glassman asked where the recommendation would be sent and when McCaffrey replied that it would go to the Assistant Regional Commissioner, Intelligence, and mentioned Grillo as a man in that office Glassman said: "That is the man. He has been approached and he is ready for it." And there is evidence that on a later occasion Glassman asked McCaffrey to let him know before the recommendation against prosecution went out in final form "so they can tell Grillo that it's on it's way over and he can grab it." Furthermore, there is evidence that at a meeting in McCaffrey's office on the afternoon of August 14, 1961, at which McCaffrey, Bergman and Gorin were present, McCaffrey, referring to Grillo, asked Gorin: "Have you given him anything?" to which Gorin replied: "He has a balance with me of $20,000," and "He has built himself a new house, and I have got about $10,000 worth of furniture in there," and also: "On this case I have given him $1,500, and I promised him $2,500 more if the case is killed." On the same occasion Gorin is reported by McCaffrey to have said that Grillo, or Henry, "gave me information on this case long before it came in here, and before I talked to Bergman about it."

All of this evidence is, of course, quite inadmissible against Grillo unless and until there is independent evidence, that is, evidence of Grillo's own acts or admissions, connecting him with the conspiracy. We find enough such evidence in McCaffrey's account of a meeting in his office on August 15, 1961, with Gorin and Grillo. At that meeting, after McCaffrey and Grillo had briefly discussed another case, Gorin is reported by McCaffrey to have said that he wanted the others either to know or to remember, that he could not recall which, "that we are here as friends, f-r-i-e-n-d-s," spelling out the last word for emphasis. Following this introduction McCaffrey testified that Grillo said that in his superior's absence he could not act on McCaffrey's memorandum against prosecuting Bergman without getting into "difficulty," perhaps "serious difficulty," that he had not expected such a strong protest to McCaffrey's memorandum from the IRS office in Hartford to which it had been referred and that he was finding it difficult in view of that protest to convince his superior and others in his office to approve McCaffrey's recommendation. And McCaffrey testified that with reference to the criminal prosecution of Bergman, Grillo said: "I would like to see it go by the board more than anyone else." Furthermore, McCaffrey testified, and the electronic recording of the meeting corroborates, that at the meeting Grillo participated actively in the discussion of arguments to advance in answer to the protest from Hartford to McCaffrey's memorandum and at the close of the meeting Gorin said: "Well, Henry, you've got the pitch now. The three of us are working together," to which Grillo replied: "I wish to hell I'd known it before."

Perhaps by straining the jury might have put an innocent interpretation on these remarks and acts of Grillo. But certainly the jury did not have to do so. The above evidence is clearly enough to warrant the jury's finding that Grillo was a participant in the conspiracy.

The appellants objected below to the introduction in evidence of the tape and wire recordings to which reference has been made. Since the electronic devices used were installed in McCaffrey's office, in his car and on his person, the recordings were not obtained through physical intrusion as in Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed. 2d 734 (1961). Therefore, the appellants do not argue that the recordings were obtained in violation of the Fourth Amendment. Apparently conceding the authority of Goldman v. United States, 316 U.S. 129, 135, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), their contention is that the recordings are in so many places inaudible as to be unintelligible and therefore untrustworthy as evidence.

The court below followed the procedure approved in Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, 55 (1956), cert. den. 352 U.S. 873, 77 S. Ct. 94, 1 L.Ed.2d 76 (1956), of having the

recordings played in the presence of counsel but not in the presence of the jury in order to rule on possible objections. After hearing the recordings their admissibility lay in the trial court's sound discretion. Monroe v. United States, supra; Cape v. United States, 283 F.2d 430, 435 (C.A.9, 1960); Todisco v. United States, 298 F.2d 208, 211 (C.A.9, 1961), cert. den. 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962). Although we have not listened to the recordings we have read the transcription of them in the record. While it appears that parts of them are inaudible, we cannot say that the parts which are not are without evidentiary value, or that the inaudible parts are so substantial as to make the rest more misleading than helpful. In short, we cannot say that the trial court abused its discretion in admitting the recordings in evidence.

Now we turn to the charge, specifically to the charge on the issue of entrapment.

The court below told counsel at the close of their arguments that it was going "to follow Learned Hand" and charge the jury that the burden was on the defendants to prove inducement. In summing up its general instructions on the issue it did so by saying: "Let me repeat that now. The two questions: Did an agent of the government induce the accused to commit the offense in the indictment? If so, was the accused ready and willing, without persuasion, and awaiting a propitious opportunity to commit the offense? On the first question the accused has the burden of proof. On the second, the prosecution has the burden of proving it beyond a reasonable doubt." [6]

The appellants concede that the court's formulation of the two questions and its

summary of them was correct. But they contend that it was error to cast the burden of proving the first question upon them.[7] They argue that the defense of entrapment is analogous to the defense of insanity. Wherefore they concede that the government need not offer evidence to disprove entrapment as part of its case in chief. But they say that once they have come forward with substantial evidence of entrapment the burden is on the government to disprove the defense beyond a reasonable doubt.

The Supreme Court has not adverted to the question.

In Sorrells v. United States, 287 U.S. 435, at page 451, 53 S.Ct. 210 at page 216, 77 L.Ed. 413 (1932), the Court for the first time recognized entrapment as a defense to a criminal charge,[8] saying:

"The predisposition and criminal design of the defendant are relevant. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. If that is the fact, common justice requires that the accused be permitted to prove it. The Government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue."

And the Court held that when the evidence of the conduct of the government's

---

6. Judge Learned Hand, writing for his court in United States v. Sherman, 200 F.2d 880, 882–883 (C.A.2, 1952), said: "Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence.

On the first question the accused has the burden; on the second the prosecution has it."

7. They, of course, do not complain of the charge as to the burden of proof on the second question.

8. It also held that the defense did not have to be pleaded in bar but could be raised under the plea of not guilty.

representatives was conflicting it was error to refuse to submit the issue of entrapment to the jury.

These basic principles were affirmed in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). In that case involving illegal sales of narcotics, the Court, 356 U.S. at page 371, 78 S.Ct. at page 820, 2 L.Ed.2d 848 said: "At the trial the factual issue was whether the informer had convinced an otherwise *unwilling* person to commit a criminal act or whether petitioner was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade." Then, 356 U.S. on page 372, 78 S.Ct. on pages 820–821, 2 L.Ed.2d 848, citing with approval and quoting from the Sorrells case, the Court noted that it did not constitute entrapment for government agents merely to afford opportunities or facilities for the commission of an offense but that entrapment occurred "only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.)" Wherefore, the Court said: "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

In drawing this line on the principles outlined in the Sorrells case, the Court in Sherman, 356 U.S. at page 373, 78 S.Ct. at page 821, 2 L.Ed.2d 848 said:

"On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence."

In short, if an accused asserts that he is a lamb who has been led astray he must be prepared to face evidence that he is a wolf on the prowl.

The above cases clearly sanction Judge Learned Hand's formulation of the two questions of fact presented by the defense of entrapment which the court below followed in its charge to the jury. For convenience they can be called the primary issue of inducement and the rebuttal issue of predisposition. And the cases also clearly indicate, as the appellants herein concede, that to raise the defense of entrapment the burden is upon them to come forward with evidence of inducement. We also assume from the language used as well as by application of general legal principles that the burden is on the government to come forward with evidence of predisposition. The cases, however, do not even indirectly mention the question of burden of persuasion on the issues. Nor do the cases give us guidance to decide the question by indicating the basis upon which the defense rests.[9]

The lower federal courts have variously allocated the burden of persuasion, usually with little if any helpful analysis. Indeed, in many of the cases it is uncertain whether when speaking of the burden of proof the court is referring to the burden of coming forward with evidence or the burden of persuasion. We shall undertake our own analysis.

The defense of entrapment is certainly analogous to the defense of insanity in that the burden of coming forward with evidence in order to raise the defense rests upon the accused. But at this point we think the analogy ceases.

The defense of insanity asserts that the mental condition of the accused is such that he is incapable of harboring criminal intent. The defense, therefore, negatives an essential element of the crime. And it is fundamental doctrine that the government must prove every essential element of the crime alleged beyond a reasonable doubt. The defense of entrapment, on the other hand, does not negative an element of the crime, or

9. See Mr. Justice Frankfurter's opinion concurring in the result in Sherman, in which Justices Douglas, Harlan and Brennan concurred, 356 U.S. page 378, 78 S.Ct. pages 823–824, 2 L.Ed.2d 848.

assert that the accused has not engaged in a criminal activity. By the defense the accused may admit his crime, as Glassman did on cross-examination when he admitted that he gave McCaffrey $10,-000 "as a bribe," or he may rely upon his right to require the government to prove the case against him beyond a reasonable doubt, and in either event ask to be relieved of its consequences because of the unsavory tactics of representatives of the government.[10] Stated another way, the defense of entrapment is not interjected to establish the absence of an essential element of the crime but to present facts collateral or incidental to the criminal act to justify acquittal on the ground of an overriding public policy to deter instigation of crime by enforcement officers in order to get a conviction.[11] Since by the defense the accused is asking to be relieved of the consequences of his guilt, if found or admitted, by objecting to the tactics of the representatives of the government, we think that one who raises the defense should be required not only to come forward with evidence but should also be required to establish inducement by a preponderance of the evidence.

We think reason commends this conclusion. And it is in accord with § 2.13 entitled Entrapment, Subsection (2), of the Proposed Official Draft of the American Law Institute's Model Penal Code, dated May 4, 1962, which provides with an exception not here material that "a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment." See also the discussion of this provision in Tentative Draft No. 9, of the Model Penal Code, supra, 1959, at the bottom of page 20 and the top of page 21.

We think the charge of the court below was correct as far as it went. It did not, however, in our opinion, go far enough, for it did not tell the jury anything about the *quantum* of the proof required. It merely informed the jury that the accused had the "burden of proof" without explaining that the burden was met by proof by a preponderance of the evidence.

Although this omission was brought to the court's attention after the charge, it did not see fit to elaborate. We think this was prejudicial error. The only burden of proof mentioned anywhere in the charge was the burden on the government to prove the essential elements of its case beyond a reasonable doubt. But from this we cannot assume, as the government argues, that the jury would apply this standard only to the government's case and never to the defendants'. On the contrary we think that since proof beyond a reasonable doubt was the only standard mentioned, the jury would naturally infer in the absence of instruction otherwise that when "burden of proof" was mentioned that was the standard they were to apply, not only to the government but also to the defendants. There must be a new trial as to all three appellants.[12]

Many other questions have been argued on these appeals. We pass them for various reasons, some for insubstantiality, and others because they are unlikely to arise at another trial or at least are

---

10. It is inconsistent for an accused to take the stand and deny the commission of the crime charged and then assert his right to a charge on the defense of entrapment. See Sylvia v. United States, 1 Cir., 312 F.2d 145. However, where there is evidence of governmental inducement, it is not fatally inconsistent for an accused to keep silent in the hope that the jury will not find that the government has proved its case beyond a reasonable doubt, but ask that the jury be charged on the defense of entrapment if it should find the commission of the allegedly criminal acts. The law allows this much inconsistency. See Henderson v. United States, 237 F.2d 169, 172-173 (C.A.5, 1956).

11. See the separate opinion of Mr. Justice Roberts, Mr. Justice Brandeis and Mr. Justice Stone concurring, in Sorrells v. United States, 287 U.S. 435, 456, 53 S.Ct. 210, 77 L.Ed. 413 et seq.

12. We find no adequate support for the government's contention that Grillo waived entrapment as a defense and is estopped from asserting it now.

unlikely to arise in the same form or in the same context.

Judgments will be entered vacating and setting aside the judgments of the District Court and remanding the cases to that Court for a new trial.