UNITED STATES of America, Appellee,

v.

Howard SMOLAR, Edward Vanasco, and Sumner H. Woodrow, Defendants, Appellants.

Nos. 75–1214–75–1216.

United States Court of Appeals, First Circuit.

Argued Oct. 5, 1976.

Decided May 26, 1977.

Thomas J. Freedman, Boston, Mass., by appointment of the Court, for Howard Smolar, appellant.

Alexander Whiteside, II, Boston, Mass., by appointment of the Court, for Edward Vanasco, appellant.

Manuel Katz, Boston, Mass., for Sumner H. Woodrow, appellant.

Richard W. Beckler, Atty., Crim. Div., Dept. of Justice, Washington, D. C., with whom James N. Gabriel, U. S. Atty., Boston, Mass., and Mark S. Davidson, Atty., Crim. Div., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

COFFIN, Chief Judge.

Appellants were charged, with two other individuals and two corporate entities, under a twenty count indictment alleging conspiracy and substantive violations of the federal securities laws.[1]  On motions at the close of the government's evidence and at the close of all the evidence, the court entered judgment of acquittal on many of the substantive counts.  Of the counts that went to the jury, appellant Smolar was convicted on all six counts; appellant Vanasco was convicted on five counts and acquitted on one; and appellant Woodrow was convicted on two counts.  Appellants raise numerous issues on appeal, not all of which merit discussion.

### Background

Security Planners Associates was a registered broker-dealer.  Among other activities, it acted under contract as investment advisor to a mutual fund known as the Technical Fund.  By 1970 each of the appellants was associated with Security Planners in some capacity.  Smolar was President of the firm and portfolio manager for the Technical Fund.  Woodrow was an attorney who acted as counsel to both the individuals and the firm.  Vanasco, who was under an SEC bar prohibiting him from being associated with any broker-dealer, did not hold an official position, but several witnesses testified that he was "running the show".

In 1970 it was determined that Security Planners Associates was having difficulties with its liabilities and bookkeeping that might endanger its registered broker-dealer status, and that a separate entity, Security Planners Limited, (Limited) should be spun-off to assume Associates' business.  It is not

1.  Smolar was charged in 19 counts, Vanasco in 13, and Woodrow in 6.

2.  In several instances counsel did question whether there was in fact sufficient proof aliunde of conspiracy to warrant admission of the testimony even subject to the limiting instruction, but there was never a challenge to the instruction itself.

3.  The court read virtually the same instruction on each occasion, which said, in full:

alleged that this transaction was illegal.  The government's theory of this case is that, between April, 1970, and September, 1972, appellants and others associated with Security Planners Limited filed false forms with the SEC and engaged in various fraudulent schemes to pump working capital into Limited in a desperate effort to keep it, and its broker-dealer registration, alive.  The government claims that the primary object of this effort to sustain Limited was to milk the only valuable asset it had—the Technical Fund.  We shall recite more specific facts as necessary in discussing the various issues on appeal.

### Instructions on the Use of Co-conspirator Hearsay Testimony

On the first day of trial, as soon as it appeared that testimony as to the out-of-court declarations of alleged co-conspirators was about to be elicited, the court on its own motion gave the jury a cautionary instruction limiting the use of co-conspirator hearsay testimony.  The court asked if counsel had any additions or corrections to suggest, and no one questioned the content of the instruction.[2]  The identical instruction was read to the jury numerous times during the trial, and again in the final charge.  At no time did any of the defense counsel suggest that the instruction was defective.  Now, however, all three appellants join in the contention that the instruction did not meet the requirements set forth in *United States v. Honneus*, 508 F.2d 566, 576–77 (1st Cir. 1974), since it allowed the jury to consider "evidence as to the actions and declarations of all alleged participants" in determining whether the conspiracy existed.[3]

"In determining, ladies and gentlemen, whether any particular defendant is guilty of participating in a conspiracy, you must first determine whether or not a conspiracy existed as charged in the indictment.

In determining whether the conspiracy existed, you should consider the evidence as to the actions and declarations of all alleged participants.

If you conclude that such a conspiracy did exist, you must next determine whether or not each defendant was a party to or a mem-

In *Honneus* we held that failure to give a proper cautionary instruction before the introduction of any hearsay testimony would thereafter be considered plain error, and "result in reversal in any case where we believe the omission to have affected substantial rights." 508 F.2d at 577.[4] We said that the court should instruct the jury that the existence of a conspiracy and the defendant's participation in it must be established by independent non-hearsay evidence before the extra judicial statement of an alleged co-conspirator could be used against the defendant. It may be conceded that the instruction in this case failed to make clear that hearsay evidence could not be used in determining whether a conspiracy existed, but it did clearly require that each defendant's participation must be established by non-hearsay evidence, which is perhaps the more important element. We do not believe that *Honneus* compels the conclusion that this instruction was so plainly prejudicial that reversal is required. The failure to alert the jury, as hearsay testimony comes in, that its use is conditioned upon certain findings which must be based on non-hearsay evidence, creates a

substantial risk that jurors, unschooled in the intricacies of the hearsay rule, will absorb all of the evidence and be unable to sort it out in accordance with a proper instruction at the close of the case. *See United States v. Apollo*, 476 F.2d 156, 163–64 (5th Cir. 1973). In the present case, however, the trial court took pains to focus the jury's attention on the difficult distinctions it would be called upon to make in using the hearsay testimony. We do not believe that the timely instruction in this case, although defective in one particular, created the same potential for prejudice to substantial rights that was present in *Honneus* and *Apollo*.

Moreover, it seems to us that framing an instruction that communicates to the jurors what they are required to do, without burdening them with so many subtleties that they cannot sensibly do it, is an extremely delicate task. The trial court solicited counsel's suggestions and, contrary to appellant's contention on appeal, there is no indication in the record that it would have been unreceptive to the arguments they now make.[5] The error now assigned could have been cured easily. While, as we said

---

ber of that conspiracy with knowledge of its illegality and with the specific intention to assist the conspiracy to its illegal objects.

In making this determination, you should consider only the evidence of the defendants' [sic] acts and statements.

If and only when the existence of the conspiracy charged in the indictment has been found by you, as a preliminary matter, and the defendant has been found to be a member of the conspiracy, solely on the basis of *testimony and evidence as to his own statements* or declarations or acts or conduct, then the acts done and the statements or declarations made by any other person found by you to be a member of the conspiracy may be considered as evidence in the case against the defendant—that is, a particular defendant that you may be considering—even though such acts and declarations may have been made in the absence of and without the knowledge of that particular defendant, provided such acts were done and such statements or declarations were made during the continuance of the conspiracy and in furtherance of the objectives or purposes of the conspiracy."

In the third paragraph, the court reporter wrote "defendants'" but we think the reasonable intendment was defendant in the sin-

gular. In any event, the final paragraph of the instruction makes clear that each defendant's participation is to be determined "solely on the basis of . . . his own statements or declarations or acts or conduct."

4. Since this case was tried before the new Federal Rules of Evidence became effective, we review the district court's instruction under the rule then applicable, as set forth in *Honneus*. Cases tried under the new rules will be governed by this court's interpretation of Fed.R. Evid. 801(d)(2)(E) announced in *United States v. Petrozziello*, 548 F.2d 20, 22–23 (1st Cir. 1977).

5. On the seventh day of this 23-day trial, the court made the following statement:

"I will say to counsel, if you wish to protect your rights with respect to the limiting instruction, you had better rise to call to my attention any errors or omissions in this instruction as I give it, because your failure to take an objection at this point I will construe as meaning that you have no objection and find no error or omission in the instruction as I have given it."

There was no response.

in *Honneus,* a timely cautionary instruction is a "minimum obligation on the trial judge in a conspiracy case", 508 F.2d at 577, *quoting United States v. Apollo, supra,* 476 F.2d at 163, this was not an invitation to counsel to ignore the contents of the instruction until appeal. We think that there is an obligation on defense counsel to give the trial court the benefit of their views on the subject, particularly when it has been the focus of considerable attention at trial.[6] Here the record makes clear that all defense counsel thought that the charge was a proper "*Honneus* instruction", and at one point actually referred to it as such. Under these circumstances, where the asserted defect was not just overlooked but was actually acquiesced in by counsel, we do not think justice requires a finding of reversible error. *See United States v. DeJesus,* 520 F.2d 298, 301 (1st Cir. 1975) (ambiguous instruction acquiesced in by counsel held not reversible error in pre-*Honneus* trial).

Finally, our review of the record indicates that the independent non-hearsay evidence that a conspiracy existed, consisting of each appellant's own actions and statements, and discussions at which all were present, was adequate by any standard. *See United States v. Diaz,* 538 F.2d 461, 464–65 (1st Cir. 1976). Since the jury was clearly instructed that only a defendant's own statements and actions could be used in determining whether he participated in the conspiracy, we think it is clear that the asserted defect in the instructions did not affect substantial rights. *See id; United States v. Honneus, supra,* 508 F.2d at 577.

---

**6.** Without implying any impropriety in the present case, we would encourage dilatory tactics, and be "unfair to the court and the public generally if a defendant can have two bites at the cherry by saying nothing and then coming back and asking for a second chance." *Dichner v. United States,* 348 F.2d 167, 168 (1st Cir. 1965).

**7.** William Rodman, who was not tried with the appellants and appellant Vanasco were also charged in this count. As to Vanasco the jury was instructed, in accordance with *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90

*Instructions on Count 11—Variance*

■ Appellants Woodrow and Smolar challenge the court's instructions under count 11 of the indictment. The indictment charged that they, with others,[7] had defrauded the shareholders of the Technical Fund by causing

"the Fund to purchase from one, John Milliken 7,500 shares of unregistered Logic Corporation warrants, having little, if any, value at a price of approximately $29,400. The aforesaid defendants further caused $29,000 from the proceeds of the sale to be diverted into the capital account of Limited and further caused $400.00 from the proceeds of the sale to be paid to John Milliken as his compensation in the transaction."

The government's main witness on this count was John Milliken. He testified that at the time of the sale registered Logic stock had a value of $8 per share, and that the warrants he sold the Fund were options to buy unregistered stock at 13 cents per share. The purchase price was $29,400, which Milliken received in the form of a $29,000 note from Security Planners Limited and a check for $400. On cross-examination, Milliken testified that this price was about "half the market", and that some months after this transaction registered Logic stock was selling at approximately $15 per share, and that it reached a high of $32.[8]

At the close of the government's case all defendants moved for judgment of acquittal on count 11 on the ground that the government had offered no evidence that the Logic warrants were "of little if any value" as charged in the indictment. The district court apparently agreed that there

---

L.Ed. 1489 (1946), that he could be found guilty only if he was a member of a conspiracy and one of his co-conspirators had committed the offense in furtherance of the conspiracy. The jury acquitted Vanasco.

**8.** The court expressed concern that the price of registered shares did not reflect the value of unregistered shares, but the testimony was not excluded. Appellants said that a relationship in value could be demonstrated.

was no such evidence,[9] but denied the motions for acquittal: the court was of the opinion that, regardless of the actual value of the shares or ultimate harm to the Fund, the scheme was fraudulent and in violation of 15 U.S.C. § 78j and Rule 10b–5 if its purpose was to defraud the Fund. As the court put it in the course of argument on the motion, it believed that individuals who set out, with fraudulent intent, to divert cash from the Fund by causing it to buy this stock should not be relieved of criminal liability simply because the stock, through mere fortuity, later increased in value.

The court's final charge to the jury briefly summarized Milliken's testimony as to value at the time of the sale, and continued:

"The issue here that you must determine, and I am going to have to just leave it to you without being able to assist you very much, but it is for you to determine from all the circumstances whether this transaction was a genuine transaction on the part of Smolar in behalf of the fund, having the interests of the fund in mind, as was his duty, or whether it was primarily a scheme to divert cash from the treasury of the fund into the treasury of Security Planners Limited.

If it was a scheme to get cash out of the fund, regardless, without any regard, any real regard being given to whether this was for the benefit of the fund or not, then it would be a fraudulent scheme within the meaning of 15 United States Code Section 78j.

If you find that even though the original plan was to subordinate, make a subordinated loan to Security Planners Limited, Mr. Smolar, on behalf of the fund, as a legitimate transaction, elected to purchase these unregistered Logic Corporation warrants, then the offense has not been committed."

The effect of the court's instruction was to remove the allegation that the warrants

were of "little if any value". The government argues that the indictment charges an offense even without this language, and that it was therefore "mere surplusage", which the district court was entitled to strike. Fed.R.Crim.P. 7(d). *See United States v. Cirami*, 510 F.2d 69, 72–73 (2d Cir. 1975). We cannot agree. Even assuming that the instruction does describe an offense under the statute, it is a significantly different offense from the one charged in the indictment. Thus, we agree with appellant's contention that the instruction constituted a material and prejudicial variance from the charge in the indictment. *See Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

The government asserts that it need not prove actual loss to investors in prosecuting fraudulent practices under § 78j and Rule 10b–5, *see* 1 Bromberg, *Securities Law: Fraud* § 2.6(1) at n. 131; *Farrell v. United States*, 321 F.2d 409, 419 (9th Cir. 1963). But the court's instruction did not simply point out that a fraudulent scheme need not be a profitable one. Rather, by eliminating the issue of value, the court materially changed the theory on which the scheme was alleged to be fraudulent. The indictment charged a sale of worthless securities—as the government put it at times during the trial, the "milking" of the Fund. The instruction, however, focuses on appellant Smolar's duty to act in the interests of the Fund, and states that the determinative issue is whether this was a "genuine transaction . . . in behalf of the fund". The distinction between outright fraud as charged in the indictment and a breach of fiduciary duty cannot be dismissed as insignificant. *Cf. Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In this context, the allegation that the Logic warrants were "of little if any value" was not merely a "useless averment", *see Ford v. United States*, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927); it was the critical averment that made the scheme, as alleged, fraudulent.

---

9. The government argued that the cash payment of only $400 to Milliken was evidence that the stock was only worth that much, but the court did not seem to accept this. In light of the theory on which this count went to the jury, we express no view on the sufficiency of the evidence in this record as to the value of the warrants.

■ Since the court's instruction did not simply remove from the jury's consideration one of several theories of fraud alleged, *compare New England Enterprises, Inc. v. United States*, 400 F.2d 58, 65 (1st Cir. 1968), but instead materially altered the theory of criminal liability set forth in the indictment, it cannot be said that the indictment sufficiently apprised appellants of the nature of the charges against them. *Compare United States v. West*, 549 F.2d 545 at 552 (8th Cir. 1977). And, apart from the prejudice appellants necessarily suffered in being forced to respond to a new theory of liability midway through trial, after the opportunity for cross-examination of the government's witness had passed, we think the variance in this case deprived appellants of the fundamental protection the grand jury is designed to provide: "to limit [a criminal defendant's] jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States, supra*, 361 U.S. at 218, 80 S.Ct. at 273. The Court reiterated in that case what had been established long before: that this protection is lost if the court is free to change the charging part of an indictment "to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes. . . ." *Id.* at 216, 80 S.Ct. at 273, *quoting Ex parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 30 L.Ed. 849 (1887). *Cf. Russell v. United States*, 369 U.S. 749, 770–71, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Cirami, supra*, 510 F.2d at 72.

■ The anti-fraud provisions of the federal securities laws are remedial in nature, and have been given a flexible construction in the courts. *See Santa Fe Industries, Inc. v. Green, supra*, 430 U.S. at 474–477, 97 S.Ct. 1292 & cases cited at n. 15. We think it is especially important when a charge is brought under generally-worded provisions like § 78j and Rule 10b–5, which prohibit a broad range of "ingenious de-

vices", *see id.* at 477, 97 S.Ct. at 1302, that the indictment state with particularity the theory on which it charges "acts, practices and courses of business which operated and would operate as a fraud and deceit." *See Russell v. United States, supra*. And we think it equally important in such cases that the government be required to prove the theory it has charged. *See Stirone v. United States, supra*. Therefore, the convictions and sentences under count 11 are vacated, and the case will be remanded for further proceedings.

*Instructions on Count 1—Variance*

■ Count one of the indictment charged appellants and several others with conspiracy to violate a lengthy list of federal securities laws. Subsequent paragraphs of the indictment described as "parts" of the conspiracy the transactions involved in the substantive counts of the indictment, and the overt acts included activities in connection with the various transactions. In its instructions to the jury on this count, the court observed that, while the indictment charged a single conspiracy, the jury might find that the evidence established a series of conspiracies. The court then instructed that, despite this "variance", "you may find either one of the defendants guilty under this count if you are satisfied beyond a reasonable doubt that they entered into a conspiracy to accomplish any one of the acts charged in the other counts in this indictment." Appellants Vanasco and Smolar contend that this instruction was a fatal variance from the indictment.[10]

We do not agree. The instruction merely establishes that the jury could convict if it found proof beyond a reasonable doubt of any one of the alleged "parts" of the conspiracy. *Cf. New England Enterprises, Inc. v. United States, supra*, 400 F.2d at 65. It, unlike the instruction under count 11, did not materially alter the theory of criminal liability on which the grand jury acted. It

---

10. All three appellants were charged under this count, but the court entered a judgment of

acquittal at the close of all the evidence as to Woodrow.

is well established that such a "variance" in a conspiracy case is not fatal if it does not result in actual prejudice to the defendant at trial. *See Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Kotteakos v. United States,* 328 U.S. 750, 767–68, 773 n. 29, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Appellants argue that they were prejudiced by the possibility that if the jury did find separate conspiracies, hearsay testimony may have "spilled over" from one conspiracy to another. However, at least as it ultimately went to the jury, this was not a particularly complicated conspiracy charge, and we think appellants' interest in keeping "separate conspiracies separate", *Kotteakos, supra,* 328 U.S. at 772, 66 S.Ct. 1239, was adequately protected by the court's instructions.

### Instructions on Count 12

■ Count 12 charges that appellants Vanasco and Smolar did "sell and cause to be sold" to the Technical Fund certain stocks, in violation of the Investment Company Act, 15 U.S.C. § 80a—17(a), which prohibits an affiliated person selling for his own account to a registered fund. The government's main witness on this count was Akiyoshi Yamada, who testified that he controlled another mutual fund, and that he and Vanasco had agreed to "warehouse" stocks for one another: that is, that each would sell stocks for his own account in equal amounts to the mutual fund controlled by the others. Thus, warehousing is essentially a manipulative device whereby a person controlling a mutual fund buys stocks for its portfolio without regard to investment merit, but solely as a favor to the seller, who may be in a position to reciprocate. The practice may have other uses, but in this case it operated to allow an affiliated person, prohibited by law from trading with his own mutual fund, to deal instead through another, nominally independent, fund.

Appellants argue that this transaction does not fall within the prohibitions of the Act, since it is clear that Vanasco did not himself trade with the Technical Fund. We agree, however, with the district court's analysis of the situation in his instruction to the jury on this count:

"This does not fit precisely within this section because the security which The Technical Fund bought was not the security which Vanasco is alleged to have sold, but if the intention was to sell a stock and get the money out of The Technical Fund, that intention was carried out by this reciprocal arrangement and it is not open to a person to avoid the strictures of this section by a device of this kind, 'You scratch my back and I scratch yours . . . .'"

The Second Circuit undertook a thorough analysis of the purposes and scope of the Investment Companies Act in *United States v. Deutsch,* 451 F.2d 98 (2d Cir. 1971). The statute was enacted in response to reports of "fantastic abuse of trust by investment company management and wholesale victimizing of security holders", 451 F.2d at 108, and was "designed primarily to correct the abuses of self-dealing which had produced injury to stockholders of investment companies." *Id.* We therefore hold that the scheme Vanasco and Yamada devised falls well within the intended prohibitions of the Act, which cannot be so cavalierly avoided by the use of artful devices and friendly combinations. An unduly restrictive interpretation of this statute would make the task of regulation impossible. Particularly in the securities area, it seems that those bent on fraud can always think of new devices when an old one is outlawed. A more flexible reading, in light of the purposes of the Act, is both sensible and fair: the language of the statute conveys a "sufficiently definite warning . . . when measured by common understanding and practices", *United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947), that the conduct charged in the indictment is proscribed. *See also United States v. Deutsch, supra,* 451 F.2d at 113–14. Therefore, we find no defect in the indictment under count 12 or in the instructions on this point.

*Prejudicial Joinder*

Appellant Woodrow moved both before trial and at several points during trial for relief from prejudicial joinder under Fed.R. Crim.P. 14 on the grounds that his alleged involvement in the scheme was far less than that of his co-defendants; that he would be prejudiced by vast amounts of testimony pertinent to his co-defendants but not to him; and that exculpatory testimony from his co-defendants would not be available to him.

Where, as here, joinder of defendants is proper under Fed.R.Crim.P. 8(b), a motion for severance under Rule 14 is addressed to the discretion of the trial court, and "defendants must make a strong showing of prejudice in order to invoke the discretionary remedies of this rule." *Sagansky v. United States,* 358 F.2d 195 (1st Cir. 1966). *See also Gorin v. United States,* 313 F.2d 641 (1st Cir. 1963). The first two grounds that Woodrow asserts are insufficient, either separately or in combination, to render denial of severance an abuse of discretion. *See United States v. Mardian,* 546 F.2d 973, 979 (D.C.Cir.1976). *See generally* 1 Wright & Miller, *Federal Practice and Procedure* § 223. And, while the availability of exculpatory testimony is an important consideration, severance is not required particularly where there has been no showing that the testimony would in fact be available upon severance, or that it would in fact be exculpatory. *See United States v. Henderson,* 471 F.2d 204, 206 (7th Cir. 1972); 1 Wright & Miller, *Federal Practice and Procedure* § 225.

As we have indicated in *Gorin, supra,* we are aware of the potential for prejudice in a complicated conspiracy trial involving several defendants. But that potential is minimized where, as here, the trial court takes great pains to give appropriate limiting instructions and to impress upon the jury its duty to determine the guilt of each defendant individually.[11]

11. In instructing the jury on the two counts involving Woodrow the court made very clear what the particular evidence of his involvement was. For this reason, and because the court instructed the jury that Woodrow was not to

*Cross-Examination of Witness Peters*

Appellants contend that their cross-examination of the government's witness Charles Peters was improperly limited when the trial court excluded inquiry into the terms of a grant of immunity to Peters in connection with a securities fraud prosecution in the Southern District of New York. They argue that, while the immunity did not extend to the acts charged in the Massachusetts indictment, that does not exclude the possibility that Peters' New York deal included cooperation in other federal prosecutions, including appellants'. We agree that a criminal defendant must be given wide leeway in his effort to impeach a government witness for bias, and we think that the line of inquiry appellants suggest would have been proper. However, if it was a proper subject of cross-examination, it was also a proper subject on direct— yet appellants succeeded in preventing the prosecuting attorney from introducing it. The district court sustained appellants' objections on the theory that the evidence of Peters' involvement in other securities frauds would be prejudicial to the appellants, since Peters was associated with them in the Security Planners firm. Having succeeded at this point, thereby preventing the prosecution from taking the sting out of cross-examination for bias, we think appellants were foreclosed from pursuing the matter. We find no error in the district court's ruling.

We have considered each of appellants' remaining contentions as to the sufficiency of the evidence, evidentiary rulings, and instructions to the jury, and find no reversible error.

*The judgments of conviction and sentences under count 11 are vacated and the case is remanded for further proceedings on this count and such resentencing as may be*

be considered as a co-conspirator, we do not think any error in the instruction on co-conspirator hearsay testimony enhanced the risk of prejudice to Woodrow.

**22**

*appropriate. In all other respects, the judgment of the district court is affirmed.*