UNITED STATES of America, Appellee,

v.

Harold RICHMAN, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

George PAPPAS, Defendant-Appellant.

Nos. 78–1190, 78–1191.

United States Court of Appeals,
First Circuit.

Argued Jan. 4, 1979.

Decided May 18, 1979.

As Amended May 31, 1979.

Anthony M. Traini, Boston, Mass., with whom Martin K. Leppo, Boston, Mass., was on brief, for appellant Harold K. Richman.

Ann Lambert Greenblatt, Boston, Mass., with whom Silverglate, Shapiro & Gertner, Boston, Mass., was on brief, for appellant George Pappas.

Elliot D. Lobel, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

On March 9, 1978, defendants George Pappas and Harold Richman were convicted after a ten day jury trial. Richman was convicted on three of four counts, and Pappas on two of three. Both were convicted of violating section 846 of title 21, conspiring to possess with intent to distribute and distributing cocaine and of violating section 841(a)(1) of title 21 and section 2, title 18, knowingly and intentionally possessing with intent to distribute and distributing cocaine on August 21, 1976. Harold Richman was convicted of the same substantive count for August 17, 1976. Richman and Pappas were tried with three other codefendants. A narrative of the evidence is essential to understand the defendants' claims of alleged errors by the trial court.

Two DEA (Drug Enforcement Administration) informants contacted Jesse Jackson, one of the five codefendants, in August, 1976. The informants, Lonnie Wilkerson and Robert Skinner, explained to Jackson that they were looking for an apartment where they could deal cocaine. Jackson operated a real estate office and a fish and chips restaurant from a single location. At several meetings during the next three days, Wilkerson and Skinner discussed with Jackson the purchase of some cocaine from him. On August 17, after being fitted with transmitters, Skinner and Wilkerson met Jackson at his real estate office where they were to await the arrival of the cocaine they wished to purchase, for a price of $1,500 per ounce. Shortly thereafter, Pappas dropped Richman at the real estate office and waited, double parked, while Richman carried a plastic baggie containing approximately one ounce of cocaine into where the others were waiting. The informants paid for the cocaine with DEA funds. After discussions concerning the possibility of future sales of cocaine, at a better price, Richman left and got back into the awaiting car driven by Pappas. Wilkerson and Skinner left after a brief discussion with Jackson, rendezvousing with DEA agents under whom they were working.

DEA agents were stationed outside the real estate office in a van equipped with a camera and receivers and taping devices for the transmissions from the informants' recording devices. The people entering and leaving Jackson's office were photographed during the approximately forty minute transaction.

On August 21, Skinner and Wilkerson, after being fitted again with recording devices, met with Jackson at a restaurant to plan a second purchase of cocaine. After agreeing on a price of $1,300 an ounce, informants agreed to purchase three ounces. The three repaired to Jackson's office and met with Richman and Samuel Coran, another of the codefendants. Coran left the others after expressing his opinion that the informants were police agents and that he did not want any involvement with them. Richman then asserted that he would need $4,000 for the proposed deal and that he would need the money up front. The informants balked at this. In the midst of the dickering, Richman went to Jackson's desk, pulled a pad of paper over, and dialed a number written on it. He said to the person on the other end of the line that "everything [was] still in motion." Richman then reported that he had some people waiting for him and exited Jackson's office to wait in his car outside. After more discussion, Skinner agreed to front $1,200 which Jackson carried outside to the waiting Richman who then drove to the Holiday Inn in Randolph, Massachusetts, where he met Pappas who was waiting for him in the lobby. DEA agents had the place under surveillance. After a short conversation, Richman went out to the parking lot and Pappas made a phone call from a lobby phone booth. As soon as he finished the call, he went out to Richman who handed him approximately ten to fifteen bills and then left. Pappas then returned to the same lobby phone and placed a call. An agent entered the booth next to Pappas and overheard the conversation which was as follows:

"Hello, is Cookie Man there . . . .
You can't use crossbows for hunting, they are illegal. I will be over in about 15

minutes to see you about that order. No, I don't want to go in the house because every time I do it takes too long. I don't have too much time. When I get there, I will blow the horn and you can come out."

Pappas left the Holiday Inn on completing the call. Agents who were tailing him lost contact before he reached his destination.

After Richman had driven off, Jackson returned to his office saying that Richman had a "million dollar connection" and waited with the informants. After some time, Skinner complained of the delay and Jackson then pulled out the same paper Richman had used in making his call earlier and dialed the number, hanging up when there was no response. Jackson then left the room and Wilkerson surreptitiously wrote the number on the inside cuff of his tennis shorts. The number was that of the phone booth at the Holiday Inn where Pappas had made his calls after meeting with Richman. Jackson returned, further discussion concerning the delay ensued, and finally Jackson called Richman. The three—Jackson, Skinner and Wilkerson—then got into Jackson's car and drove to Howard Johnson's in Canton, Massachusetts, where Jackson gave another $300 of Skinner's DEA funds to Richman, who was waiting in his own car nearby. While Jackson was with Richman, two gunmen came over and stood sentinel at Jackson's vehicle and waited there until Jackson returned and handed Skinner and Wilkerson a package of cocaine.

*Alleged Failures of Government to Comply with Discovery Requests and Alleged Misrepresentations to Obtain Continuance*

Both Richman and Pappas allege that delays by the government in complying with discovery requests, purported misrepresentations by the government to obtain a continuance, and alleged countenancing of perjury before the grand jury by the informants constituted such serious misconduct that the indictments should have been dismissed.

The Assistant United States Attorney, Nasif, originally handling the case failed to disclose to defendants that Skinner and Wilkerson were paid informants. At a hearing held by the trial court, he explained that he thought that the payments being received by the informants were to cover expenses they incurred while acting as undercover agents and were not in exchange for either grand jury testimony or testimony at trial. In fact, the informants had received about $17,000 between them during the period March, 1976, through March, 1977. On December 30, 1977, defense learned that Wilkerson had been a paid informant and, on the following day, they learned that Skinner had also been a paid informant. Trial was scheduled to begin on January 3, 1978. The trial actually began on February 21, 1978.

■ The error by the original government attorney handling the case in failing to provide the above information was regrettable, but, given the circumstances of this case, not so prejudicial as to warrant a dismissal. We assume for purposes of this discussion that had the government exercised "due diligence," Fed.R.Crim.P. 16(a)(1)(A), it could have obtained the information in time to comply with the automatic discovery order which it answered in September, 1977. The requested information *was* provided in advance of trial. The delay was the product, not of willful misrepresentations or bad faith, *compare United States v. Banks,* 383 F.Supp. 389, 392–3 (D.S.D. 1974), *appeal dismissed sub nom. United States v. Means,* 513 F.2d 1329 (8th Cir. 1975), but of a negligent misunderstanding by the government attorney. The defense had already been armed with the information that the informants were participating in the witness protection program—which, as the defense knew, carried with it financial assistance—that one of the informants had received consideration in a criminal case, and that one had a criminal record. This information alone is potent ammunition in a defense attorney's arsenal for impeaching a government witness. When the information on Skinner and Wilkerson came to light, the new prosecutors quickly made it available to the defense and the

court permitted a continuance on January 3, 1978, for the defense to digest it. The trial court found insufficient prejudice to warrant the extraordinary relief of dismissal. No deliberate wrongdoing by the government or prejudice to the defendants was evidenced. The district court has discretion in handling non-compliance with discovery orders and the manner chosen by the court here was not an abuse of that discretion. *See United States v. Gladney,* 563 F.2d 491 (1st Cir. 1977); *United States v. Hathaway,* 534 F.2d 386, 402 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

█ Closely aligned with the above charge is that Nasif countenanced perjury before the grand jury in January, 1977, when the informants, when asked if they had received any consideration in exchange for their testimony, responded that they had received promises of protection. No mention of the nearly $17,000 was made. During the hearing held by the district court, Nasif stated that he did not learn that the two informants were on the government payroll or that they had received those sums until December 1977. Nasif was unaware at the time of the grand jury questioning that the informants were on the payroll and had received close to $17,000. It is clear from this that there was no countenancing of perjury by the government. It may have been negligent for the government not to have known that the DEA had the two informants on the payroll in January, 1977. Negligence is not converted into subornation on these facts.

█ The most serious allegation defendants raise is that the government obtained a continuance by use of a ruse, namely, by representing to the court that Wilkerson would not be available for trial in November, 1977, because of emergency surgery which, as later learned, was never performed. On or about November 4, 1977, the United States Marshals' Protection Service contacted Nasif to tell him that Wilkerson had been placed in the hospital and required major surgery involving approximately two months' recuperation time. Ac-

cordingly, on November 7, the government sought a continuance. In fact, Wilkerson was released from the hospital without having undergone surgery and travelled to New York to testify in another drug case on December 5 through December 7, 1977. Defendants allege misrepresentation in obtaining the continuance and interference with their rights to a speedy trial.

The district court explored this carefully, learning that the United States Marshals' Service had placed Wilkerson in the hospital at an undisclosed location (by that time Wilkerson was under the custody of the protection service) on November 2, 1977, and so informed the United States Attorney in Boston on November 4. An affidavit from the United States Marshal to this effect was filed with the district court and impounded. Hospital records were also obtained and made available to the defense. Wilkerson was hospitalized with myasthenia gravis, a syndrome marked by "progressive paralysis of muscles," Dorland's Illustrated Medical Dictionary 1004 (25th ed. 1974), with the expectation that he would have surgery. Surgery was not performed and Wilkerson was released from the hospital on November 7. It was not until November 18 that the Marshals' Service contacted Nasif with the information that Wilkerson was out of the hospital and en route to New York where he was expected to testify in a trial. By that time, it was too late to schedule a trial for December; Nasif, himself, fell ill on November 21 and was hospitalized during much of the next six week period when he was away from the office. In December, the case was transferred to new government attorneys and trial set for January 3, 1978. There is nothing in this set of facts to suggest that the government obtained the continuance by artifice or that the government intentionally misrepresented facts to the court.

Defendant Richman urges us to find that his right to a speedy trial, as guaranteed by the sixth amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.,* was abridged

by the resulting delay and that the indictment should have been dismissed.[1]

Richman and Pappas were indicted by the grand jury on July 18, 1977, and were arraigned on July 20 and July 22, respectively. Trial should have been had within one hundred twenty days, less excludable time. 18 U.S.C. § 3161(g). The magistrate's report, prepared on November 3, 1977, indicated that the case would have to be tried on or before January 3, 1978, to be within the Act's requirements. Therefore, when the government requested the continuance on November 7, no violation of the Speedy Trial Act was involved. After the transfer of the case to two new government attorneys, trial was set for January 3, 1978. The continuance granted on January 3, 1978, was granted to allow further exploration of the allegation that the November 7th continuance had been obtained fraudulently, to allow defense to review revised tape transcripts they had recently been provided, and to allow defense proper preparation due to their having learned the week earlier that Wilkerson and Skinner had been paid informants.[2] At the January 3 hearing, the district court indicated that it would proceed with trial that day, since the jury panel was ready, if the defense so desired. When the defense indicated that it would welcome the continuance so as to better prepare,[3] the court continued the case to February 7, 1978. The case actually began on February 17, since Boston was hit with a paralyzing blizzard the week of February 7, 1978. The court continued the case on January 3, 1978, after an extensive hearing. The Speedy Trial Act permits such continuance when the court finds that the ends of

justice being served by such delay outweigh the defendant's interest in a speedy trial. 18 U.S.C. § 3161(h)(8)(A).

Below, Pappas specifically abjured any allegation of a sixth amendment abridgement as a result of the delay, relying solely on the Speedy Trial Act. The lower court repeated that the claimed problems attending the delay appeared to be premised on the statute rather than on the constitution; none of the defense attorneys contradicted this view. Nonetheless, on appeal, Richman claims a sixth amendment violation.

■ Since dismissal under the Speedy Trial Act is not a mandatory sanction until July, 1979, 18 U.S.C. §§ 3162(a)(2), 3163(c), we analyze the delay in terms of the guidelines we established in *United States v. Johnson*, 579 F.2d 122 (1st Cir. 1978) for sixth amendment claims. We shall balance the conduct of the government against that of the defense and factor in neutral elements. *Id.* at 123–4. Included in the consideration are "the length of and reasons for the delay, the nature of defendant's assertions of his right to a speedy trial, and the prejudice caused to defendant as a result of the delay." *Id.* at 123. The delay here between arraignment and trial was seven months. Unlike the *Johnson* case, here the charges were not simple nor the case uncomplicated: five defendants were involved, an indictment charging a conspiracy and substantive counts was at stake, undercover agents were to give testimony, transmissions from body tapes had been sought to be introduced.

1. Neither defendant argues that dismissal was required for failure to meet the district court's Plan for Prompt Disposition of Criminal Cases or that the court abused its discretion by failing to dismiss under Fed.R.Crim.P. 48(b).

2. Defendants have artfully phrased their issues in a way such as to place the government in the position of being whip sawed. On the one hand, the defense argues very persuasively that the failure of the government to provide the information on the payments to Wilkerson and Skinner during the automatic discovery in September required a remedy from the court. The court did fashion a remedy, namely, continuing

the case on January 3. The defense also argues that the continuance deprived them of a speedy trial. Since the government here brought much of the confusion down upon itself, we carefully consider the speedy trial claim. Were the circumstances otherwise, we might look somewhat askance at such a claim when the continuance had been granted to accommodate defendants.

3. The defense took pains to state that, though welcoming the delay, they intended to reserve this point for appeal.

The case was originally set for trial during the week of November 27, 1977. The magistrate's report of November 3 indicated that it was not ready for trial due to several pending pretrial motions. On November 7, the government sought a continuance due to information received from the Marshals' Service that a key witness would be unavailable for approximately two months due to medical reasons. The government attorney handling the case left the office on November 21 and was hospitalized for most of the succeeding six weeks; the case was transferred to new government attorneys in December. Transcripts of the tape recordings which the government hoped to offer were revised and given to defense on January 3, 1978. The actual tapes had been made available to the defense in August, 1977, and again around the second week of December. The transcript of the tape was an additional listening aid which the trial court had suggested both the government and defense bring to the court on January 3. The defense asserted that the tape transcript caught them by surprise and that they would be unable to adequately defend their clients if not given time to review the transcript. Due in part to this claim, plus other alleged delays in receiving discovery materials and the allegation of government impropriety in seeking the November 7 continuance, the court continued the case. The court meticulously inquired as to the availability of the five different defense counsel in setting the new trial date. He suggested that trial began on either January 31 or February 7; defense counsel requested the February 7 date. Trial could not commence on February 7 due to the Blizzard of '78 and was reset for February 21.

Continuing with the *Johnson* analysis, we find that there was a certain culpability on the part of the government in delaying discovery information and in the errors involved in providing both the tapes and the tape transcripts. However, part of the confusion and delay stemmed from the illness of the original prosecutor, the transfer to new attorneys, the devastating snowstorm, and the difficulty in coordinating with attorneys for the five defendants. Also at play was the district court's desire to explore thoroughly the claims of prosecutorial misconduct prior to trial. When we balance these facts against the lack of prejudice evinced in this case, we see no constitutional deprivation caused by the delay.

■ None of the defendants was incarcerated prior to trial, no essential witness or evidence became unavailable or stale during the delay, the case did not revolve around eye witness reports which admittedly begin to fade with the passage of time, *compare United States v. Butler,* 426 F.2d 1275 (1st Cir. 1970), but rather upon testimony by undercover agents, tapes of meetings with the defendants, and photo surveillance. Although the cloud of an indictment was hanging over the defendants necessarily causing some anxiety, the seven month delay here was not so long as to be inherently burdensome. Neither Pappas nor Richman particularizes in what fashion their defense suffered as a result of the delay. Nor do they particularize any other prejudice resulting from the delay, *compare United States v. Fay,* 505 F.2d 1037, 1038–9 (1st Cir. 1976). Upon a careful review, we have been unable to find any. Mindful of the admonition that the interests of public justice should be weighed in these determinations, *see Barker v. Wingo,* 407 U.S. 514, 519–22, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905), after a balancing of the interests here, we are satisfied that no sixth amendment violation occurred from the delay.

*Admission Into Evidence of Tapes and Transcripts*

■ Richman claims that the court should have suppressed the body tapes and that the jury should not have been permitted the transcript of the tapes. Admission of tapes is left to the sound discretion of the trial court. *United States v. Nashawaty,* 571 F.2d 71, 75 (1st Cir. 1978); *Gorin v. United States,* 313 F.2d 641, 652 (1st Cir. 1963), *cert. denied,* 379 U.S. 971, 85 S.Ct.

669, 13 L.Ed.2d 563 (1965). It is similarly within the discretion of the court to allow a transcript to accompany the playing of tapes so long as the court makes clear that the tapes, not the transcript, constitute evidence in the case. *United States v. Nashawaty, supra,* at 75; *United States v. DiMuro,* 540 F.2d 503, 511 n.13 (1st Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). The court here complied with all appropriate safeguards. Richman's allegation that the recording admitted into evidence was a selective composite created by the government rather than an original is without merit. The tape was a quarter-track stereo tape which synchronized the two tapes taken from Skinner and Wilkerson; both Skinner's and Wilkerson's tapes were contained on separate tracks and the composite which was played to the jury was a stereo reproduction of the two body tapes.

Richman's contention that the court allowed the transcript to be read by the jury without first verifying it is similarly lacking in merit. The accusation that the government employed "unusual placards" which improperly accentuated selected portions of the tape is baseless. The placards were simply instructions to the jury, telling them when to turn the page of the transcript, to assist any juror who might have momentarily lost the place.

▮ Richman's last point is that his privilege against self-incrimination was violated by the playing of the tape. No authority is cited in support of this novel theory. Richman's statements were not compelled, coerced, or involuntary, *compare Lefkowitz v. Cunningham,* 431 U.S. 801, 804–6, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 177 L.Ed.2d 562 (1967); *cf. Gabrilowitz v. Newman,* 582 F.2d 100 (1st Cir. 1978) (since uncompelled testimony in student disciplinary proceeding would be available in subsequent criminal proceeding right to counsel obtains), so their use implies no constitutional violation.

*Allegation of Juror Misconduct*

▮ Both Richman and Pappas allege that the court inappropriately resolved the issue of juror misconduct. In *United States v. Doe,* 513 F.2d 709 (1st Cir. 1975), we outlined the steps a trial court should take when juror misconduct has been alleged: ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; if not clearly unprejudicial, grant a new trial; specify reasons if the court determines either that the misconduct did not take place or was not clearly prejudicial. Id. at 711–12. It is left to the discretion of the trial court to choose the extent and type of investigation required to resolve the question. Here, the court, when apprised of potential juror misconduct, called the errant juror into chambers for questioning on the record. He then held another hearing on the record with all counsel present.

The juror had made a remark to one of the United States Marshals after the marshal had opened a window in the jury room and had cautioned the jurors against an inadvertent fall. The juror's remark, made outside the hearing of the others, was "[w]e could save the government a lot of money by throwing the bums out the window." This comment was made on March 1, the sixth day of trial.

The court ascertained that, in fact, the remark was made and then made the following findings on the record: that the juror had made no attempt to influence any other juror one way or the other; that he was a self-confessed jokester, one who kidded with everyone; that his comment was made in the nature of a joke and did not display any animus against the defendants; that, although the court thought he could still render a fair verdict, he would be excused to assure not only actual fairness, but the appearance of fairness as well. Since the court determined, after questioning the juror closely, that his comment had not been overheard by other jurors, nor had he attempted to exert improper influence over other jurors, it denied a request for individual interrogation of the remaining jurors

and the request for a mistrial.[4] The court adequately explored the allegation that the jurors had been discussing the case among themselves, determining that they had not reached any final judgments or drawn any impermissible conclusions.

The court complied with the requirements set forth in *United States v. Doe, supra*, 513 F.2d 709. We find neither error nor abuse of discretion in the court's handling of this matter. *United States v. Almonte*, 594 F.2d 261, at 266 (1st Cir. 1979).

### Trial Court's Comments and Instructions to Jury—Defendant Richman

■ We have examined the language defendant Richman claims improperly invaded the province of the jury and have found no reversible error. On the third day of trial, the court made its determination, *see United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), with respect to the admissibility of certain evidence against certain of the defendants. The precise nature of Richman's claim on appeal is uncertain though it appears to be two-pronged: (1) that the court should not have communicated its threshold finding of a conspiracy (made in advance of admitting coconspirator statements in evidence) to the jury, and (2) the court impermissibly informed the jury that they could conclude that the evidence admitted thus far justified their finding that Richman and Jackson had engaged in a conspiracy. It does not appear from the record that an objection was properly made to the first point. *Saville v. United States*, 400 F.2d 397, 400 (1st Cir.), *cert. denied*, 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 768 (1968). We see no plain error: the court did not advise the jurors that it had concluded that a conspiracy in fact existed, but merely prepared them for the coconspirator testimony which was to follow.

■ With regard to the second point, the court stated to the jury that "you may have concluded at this point that there has been a showing, at least an initial showing, by the government of a conspiracy here to sell cocaine involving more than Mr. Jesse Jackson." An objection was made that this suggested to the jury that it was proper for them to have already come to a conclusion on this point. The court thereupon gave a curative instruction emphasizing that the jury should make its determination "only at the end of the case and after you have deliberated about the case in the jury room." He reiterated that no final conclusions in the case should be made by the jury until all the evidence was in, the closing arguments made, and the court's instructions issued. The court effectively cured whatever error had been made. *See Lussier v. Gunter*, 552 F.2d 385, 389 (1st Cir., 1977); *United States v. Sklaroff*, 506 F.2d 837, 839 (5th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975).

■ Richman raises another issue with respect to the court's comments, namely, that by saying to the jury "[i]f you have so concluded . . . that this testimony . . . has to do with things *in furtherance of the conspiracy*" (emphasis added), the court made it incumbent upon the jury for them to find a conspiracy. Richman would wrench the emphasized passage out of context, and view it as a directive to the jury that a conspiracy, in fact, existed. We cannot read the words of the trial judge as singular, insular statements, the correctness of which—standing alone—will determine the fairness of the overall charge. "[W]e accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–7, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (citation omitted). Read in conjunction with the court's entire statement, which continuously emphasized to the jury that it was theirs to decide whether a conspiracy existed and whether any or all of the defendants participated, no impermissible invasion of the jury's province occurred

---

4. *Cf. United States v. Pierce*, 593 F.2d 415 (1st Cir. 1979) (mistrial for alleged juror misconduct raises double jeopardy issue when some defendants oppose action).

from the above-cited comment. *United States v. Elliott*, 571 F.2d 880, 906 (5th Cir. 1978), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1979); *United States v. Spagnolo*, 546 F.2d 1117, 1120 (4th Cir. 1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977).

██ The court's instruction that the tapes constituted corroborative evidence was not error. The court left it to the jury to determine whether they corroborated the informants' testimony that the persons being spoken to were Richman and Jackson, merely stating to the jury that the tapes were corroborative evidence that a meeting between some people had been held and a discussion of cocaine had ensued. We find no merit to Richman's position that the court introduced an improper hypothetical in instructing the jury. The collateral source argument had been discussed and proposed by defendants during the trial; the court did no more than refer to a theory the defense had first interjected.

### Pappas As A Coconspirator

Pappas contends that the court erred in concluding that he was linked to the conspiracy, in refusing to direct a verdict of not guilty on the substantive count, and in failing to sever his trial from his codefendants. He further presses us to find that the government's order of proof deprived him of a fair trial. We treat these contentions together since they all hinge on the central tack of Pappas' role in the conspiracy.

██ Prior to admitting evidence against Pappas, the district court found by a preponderance of the evidence that he had been linked to the conspiracy. *See*

*United States v. Petrozziello, supra*, 548 F.2d 20. This determination, made on the eighth day of trial, followed the testimony by two government agents who had been staked out at the Holiday Inn on August 21 where Richman met with Pappas, conversed with him, handed him some cash, and where Pappas then made his "Cookie Man" call stating that he would be over shortly to pick up his "order." The independent evidence further showed that the number from which Pappas made his "Cookie Man" call was the same number which Richman had dialed during the negotiations with the informants to inform the person on the other end of the line that "everything [was] still in motion." [5] Shortly after having placed the call, Richman left to meet Pappas at the Holiday Inn where he turned over some cash. The telephone number had been copied onto Wilkerson's tennis shorts and introduced. Other nonhearsay testimony had been admitted which showed that Pappas had driven Richman to Jackson's offices on August 17, and waited, double parked, while Richman carried one ounce of cocaine to the waiting clan. The discrete facts, when viewed together, and inferences reasonably drawn from them, adequately underpin the court's determination that Pappas had been shown, by a preponderance of the evidence, to have been an integral cog in a smooth cocaine-selling machine. *See United States v. Martorano*, 561 F.2d 406, 408 (1st Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978).

In advance of its *Petrozziello* determinations, the court held several conferences at the side bar, first for defendants Jesse and Charles Jackson, Richman and Coran and

---

**5.** The sequence of events includes only one aspect of hearsay evidence, *i. e.*, Richman's comment on the phone that everything was still in motion. Pappas' "Cookie Man" conversation is not hearsay. Fed.R.Evid. 801(d)(2). Stripped of Richman's comment, the evidence lays a sufficient groundwork for the court's *Petrozziello* determination. The hearsay by Richman more than meets our standard of reliability—the tapes corroborated it—articulated in *United States v. Martorano*, 557 F.2d 1, 12 (1st Cir.), *reh. denied*, 561 F.2d 406 (1st Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484,

55 L.Ed.2d 515 (1978). Other hearsay connecting Pappas to the conspiracy was Richman's reference to Pappas as being a man in a hurry who didn't have time to wait for more than one ounce to "come up the line" on August 17 (when the informants received only one ounce rather than the two ounces of cocaine previously agreed upon). Each informant's testimony on this corroborated the other's; the tape recordings further reinforced its reliability. It must, nonetheless, be emphasized that the evidence independent of any hearsay was sufficient under *Petrozziello*.

then later for Pappas. The court amply satisfied its responsibilities under *Petrozziello. See also* Fed.R.Evid. 104.

 Pappas next argues that he was entitled to a directed verdict on the substantive count of distributing and possessing with intent to distribute. The evidence and all reasonable inferences will be viewed in the light most favorable to the government. *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir. 1978); *United States v. Scibelli*, 549 F.2d 222, 229 (1st Cir. 1977). The evidence and inferences drawn therefrom substantiate the jury's finding that Pappas aided and abetted the principals Jackson and Richman in distributing cocaine. His link was not mere presence at the scene, *compare United States v. Mehtala*, 578 F.2d 6, 9 (1st Cir. 1978), but included driving Richman to deliver cocaine, waiting for Richman at the Holiday Inn following Richman's call to a pay phone there, receiving cash from Richman and then placing the "Cookie Man" call wherein he informed the listener that he would be over to pick up his "order." The jury could logically have concluded that Pappas was the crucial link between the street people who dealt directly with purchasers and the highers-up in the chain who supplied the cocaine. Richman's reference to Pappas as having received the cocaine from "up the line" and Jackson's oblique reference to Pappas as a "million dollar connection" further establish Pappas' role as an active aider and abettor to distribute cocaine. There was sufficient evidence to warrant the jury's conclusion that Pappas associated himself with the venture, participated in it, and assisted in bringing it to fruition. *Accord, United States v. Kilcullen*, 546 F.2d 435, 445 (1st Cir. 1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977); *United States v. Hathaway, supra*, 534 F.2d at 399.

 The conjunctive pleading, *i. e.,* possession with intent to distribute *and* distri-

bution, does not require the prosecution to prove *both* since the statute speaks in the disjunctive, setting forth several different means by which the offense may be committed. Pappas was indicted under 18 U.S.C. § 2 and under 21 U.S.C. § 841(a)(1), which makes it unlawful for a person to knowingly and intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]" Having proved that Pappas aided and abetted the distribution of cocaine, the government did not also have to prove possession with intent to distribute in order that the conviction under the statute be upheld.[6] *United States v. Barbato*, 471 F.2d 918, 922 & n. 3 (1st Cir. 1973); *United States v. Lee*, 422 F.2d 1049, 1052 (5th Cir. 1970). "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970) (footnote omitted). *See also United States v. Hathaway, supra*, 534 F.2d at 398 n. 11.

 Pappas contends that the order of proof at trial deprived him of a fair trial. He does not allege that he made any protective motions during the trial, though he did move for a severance at different junctures. Our review of this question will be limited to an analysis of whether the court abused its discretion in allowing the trial to proceed as it did. "[The trial judge] may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion." *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). *See* Fed.R.Evid. 611(a).

In this case, given the role allegedly played by Pappas, it is hard to imagine how

**6.** Pappas inaptly relies on *United States v. Jackson*, 526 F.2d 1236 (5th Cir. 1976), for support of his position. Unlike the case here, *Jackson* entailed an indictment with a single count of possession with intent to distribute. Since the proof at trial indicated that he could

properly have been charged with distribution, but not possession, the court reversed his conviction. Here, defendant was charged with *both* possession and distribution and the government adequately proved its case with respect to the distribution count.

the trial could otherwise have proceeded. While it is true that attention did not focus on him until the eighth day of trial, this was due to the court's deference to Pappas' attorney who requested leave to absent himself from the trial for two days. The court, reluctant to proceed with the key witnesses against Pappas without his lead attorney there, rescheduled the appearance of the two key witnesses and another witness took the stand on the sixth day of trial. That witness continued on the stand until the eighth day of trial at which time Pappas' trial counsel returned to court. It strains our reading of fair play to hear now that this delay, granted solely to accommodate him, prejudiced defendant Pappas.

To the degree that Pappas complains that, notwithstanding the delay of two days, the case against him should have been introduced earlier, we merely comment that the trial court did not abuse its discretion in permitting the evidence to come in as it did. Pappas was not one of the front men in the conspiracy, but rather played the role of intermediary between the sellers and the suppliers. It is difficult to see how the proper foundation for a case against him could have been laid in the absence of first establishing the factual background involving the sales themselves, the negotiations over quantity and price, and careful identification of the players. As aptly observed by then Circuit Judge Griffin F. Bell: "More often than not the clandestine nature of a conspiracy is such that proof, necessarily circumstantial, requires a number of items of evidence before an inference of the conspiracy can be fairly drawn." *Strauss v. United States*, 311 F.2d 926, 931 (5th Cir.), *cert. denied.*, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963).

Pappas' contention that he was deprived of the opportunity to effectively cross-examine because of the order of proof requires little comment. Counsel was apprised well in advance of trial what the government's case against Pappas consisted of and had ample opportunity to cross-examine witnesses and preserve the record in any way deemed desirable.[7] Trial counsel made the judgment not to engage in active cross-examination during the early stages of the case. This is a trial tactic to which defendant will be held. *United States v. Sclamo*, 578 F.2d 888, 892 (1st Cir. 1978).

Pappas concedes that merely because a defendant's role in a conspiracy is less than his coconspirators and that much of the evidence adduced against them would prejudice him, he is not entitled to a severance. *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir.), *cert. denied sub nom. Vanasco v. United States*, 434 U.S. 866, 98 S.Ct. 203, 54 L.Ed. 143 (1977). Nonetheless, he attempts to argue that he was entitled to a motion to sever. Pappas does not argue that joinder of defendants was improper under Fed.R.Crim.P. 8(b). In such instances, a motion to sever under Fed.R. Crim.P. 14 is addressed to the sound discretion of the trial court. *Ibid.* Defendant fails to mount the requisite "strong showing of prejudice," *Sagansky v. United States*, 358 F.2d 195, 199 (1st Cir. 1966), cited in *Smolar*, 557 F.2d at 21, necessary to find abuse of discretion by failure of the court to grant the motion. Here, as in *Gorin v. United States, supra*, 313 F.2d at 646, the trial court took pains to minimize any possible prejudice engendered by joinder via limiting instructions throughout the trial and in its final instructions to the jury. The jury returned a discerning verdict, acquitting Pappas on count 2, convicting him on counts 1 and 4. Richman was acquitted on count 3, convicted on counts 1, 2, and 4. Jesse Jackson was convicted on counts 1, 2, and 4 and acquitted on count 3. Charles Jackson was acquitted on all charges against him, counts 1 and 3, and Coran was acquitted on count 1, the only charge against him. This demonstrates the jury's

---

7. Much of Pappas' appellate counsel's argument on order of proof consists of a straw man: namely, that undue prejudice can inure to an *innocent defendant* if coconspirator statements are admitted in advance of making the *Petroz-* *ziello* determination. Counsel in no way articulates what coconspirator hearsay statements were prejudicially allowed in against Pappas, nor, in fact, that there were any coconspirator hearsay statements.

ability to segregate the evidence and carefully weigh against which defendant it was applicable. *United States v. Luna*, 585 F.2d 1, 4–5 (1st Cir. 1978); *United States v. Martinez*, 479 F.2d 824, 828 (1st Cir. 1973).

*Miscellany*

The judge did not err in refusing to recuse himself. *United States v. Cowden*, 545 F.2d 257, 265–6 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). *Cf. United States v. Gullion*, 575 F.2d 26, 29 (1st Cir. 1978) (alleged bias must stem from extrajudicial source). No showing was made that a change of venue was required. Fed.R.Crim.P. 21. We perceive no reversible error in the court's evidentiary rulings complained of on appeal. Fed.R. Evid. 613(b). *United States v. Luna, supra*, 585 F.2d at 6. No specific objection was taken to the instruction alleged by Pappas to have been improper. We see no plain error in the instruction, *see* Fed.R.Crim.P. 52(b), so Pappas is barred from raising it here. *Cf. Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (orderly procedure requires adversaries to indicate errors in court instructions).

*Affirmed.*