**SANGAMO CAPACITOR DIVISION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 78–6–00999.**

United States Court of International Trade.

March 15, 1985.

Barnes, Richardson & Colburn, New York City (David O. Elliott and Jack D. Mlawski), New York City, for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office (Saul Davis), New York City, for defendant.

FORD, Judge:

This action involves the proper classification of silvered mica plates in four frame sizes which are designated as D–10, D–15, D–19 and D–30. The merchandise was classified under Item 685.80 as Electrical Capacitors, fixed or variable, which provides for a rate of duty of 10% ad valorem.

Plaintiff claims the merchandise is entitled to entry free of duty under the Generalized System of Preferences under A516.-94 as articles not specially provided for, of mica or A656.15 as articles of silver.

The statutory provisions and headnotes involved herein provide, so far as is pertinent, as follows:

Tariff Schedules of the United States, General Headnotes and Rules of Interpretation—

9. <u>Definitions</u>. For the purposes of the schedules, unless the context otherwise requires—

\* \* \* \* \* \* \*

(f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an article and a material (e.g., "furniture <u>of</u> wood", "woven fabrics, <u>wholly of</u> cotton", etc.), have the following meanings:

\* \* \* \* \* \* \*

(i) "of" means that the article is wholly or in chief value of the named material;

\* \* \* \* \* \* \*

10. <u>General Interpretative Rules</u>. For the purposes of these schedules—

\* \* \* \* \* \* \*

(f) an article is in chief value of a material if such material exceeds in value each other single component material of the article;

\* \* \* \* \* \* \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

Classified under—

685.80 Electrical capacitors, fixed or variable ................... 10% ad val.

Claimed under—

A516.94 Articles not specially provided for, of mica .............. Free (under Generalized

System of
Preferences)

Articles of precious metal, including rolled precious metal:

 \* \* \* \* \* \* \*

A656.15 Of silver, including rolled silver ......................... Free (under
Generalized
System of
Preferences)

The record in addition to the official papers, which were received in evidence without being marked, consists of the testimony of three witnesses called on behalf of plaintiff and the receipt into evidence of fifteen exhibits introduced by plaintiff. Defendant called one witness on its behalf and introduced eight exhibits into evidence.

Plaintiff's witness, Mr. Charles L. Rogers, is the Manager of Quality and Reliability Control of mica capacitors for plaintiff. For twenty-nine years prior he held the same position covering the entire plant. Plaintiff manufactures three types of capacitors—mica, aluminum electrolytic and power factor capacitors. The witness is familiar with the silvered mica plates involved herein and the manufacture of them in India. The supplier, J.V. Electronics, was established in accordance with plaintiff's specifications and utilized plaintiff's equipment, supervisory personnel and training in setting up the manufacturing operation.

Exhibits 1 through 4 were identified as the four sizes of mica plates involved in this litigation. According to the witness, the imported merchandise consists of two basic materials, mica and silver. They are produced by placing a raw mica blank into an oven to remove moisture. It is subsequently stored in a low temperature oven to keep it moisture-free. The mica is thereafter stacked for efficient assembly and silver is applied to one side of the mica by a silk-screening process. It is dried and the silk-screening process is repeated over the first pattern.

After importation the imported merchandise is manufactured into dipped wire lead capacitors. The witness identified Exhibit 5 as a chart he had prepared covering the process of manufacture of the capacitors in the United States. The following steps are covered by Exhibit 5:

Step 1. The imported silver mica plate.

Step 2. Illustrates that the silvered mica plate is electrically inspected to determine whether or not there are any fractures or shorts in the mica itself and is then sorted into various thickness ranges.

Step 3. An illustration of the tin lead foil which will be used in a later stage in the process to make contact with the silver. Two foils are actually used in the process but only one illustrated on the chart.

Step 4. Represents plain or clear mica, referred to as a backer, which is used as an insulation material on the top and bottom of the assembly of components in the next step.

Step 5. Illustrates the assembly of the foil, the silvered mica plate, and the insulating mica called the backer.

Step 6. Shows how the multiple sections are put together in the prior step.

Step 7. The assembled section is checked for imperfections by applying voltage to the assembly.

Step 8. A varnish is applied by dipping the entire assembly. The varnish is applied to hold the assembled section together for further processing.

Step 9. The assembled section is placed in an oven to cure the varnish.

Step 10. Illustrates the fully assembled multiple section after oven curing.

Step 11. The assembled section is emersed in a bath to remove any contaminants such as chlorides and sulfides within the section assembly.

Step 12. The multiple sections are sawed into individual sections.

Step 13. Illustrates one of these sections resulting from the sawing of the multiple section.

Step 14. Illustrates the clips and leads that are used in the manufacturing process. There are two clips and two leads for each section.

Step 15. Illustrates how those clips and leads are applied to a section.

Step 16. The clipped section is adjusted and calibrated.

Step 17. The component is then washed again to remove any contaminants.

Step 18. The component is placed in an oven to remove any moisture left within the section.

Step 19. A sealant is applied to the clipped section to improve the moisture resistance of the assembly.

Step 20. The assembled section is oven baked to cure the sealant.

Step 21. An epoxy is applied for the purpose of bonding together any delaminated or fractured pieces of mica which may have occurred during the sawing operation.

Step 22. The product is then placed into an oven to cure the epoxy.

Step 23. The clipped section is encased in epoxy.

Step 24. The clipped assembly is placed in an oven to cure the epoxy.

Step 25. The encased assembly is placed in an oven to stabilize the article.

Step 26. The product is washed.

Step 27. The article is measured for voltage stress, capacitance and dissipation factor.

Step 28. The finished capacitor is marked to indicate the capacitance value or code and the working voltage of the unit.

The code system would additionally indicate the size of the capacitor.

Step 29. The mark is cured in an oven.

Step 30. Illustrates the article being packed for shipment to the customer. (R. 20–23.)

With the exception of the packing indicated in Step 30, each of the manufacturing steps is required to produce a commercially saleable mica capacitor which would be in compliance with the EIA (Electronic Industries Association) standards, a copy of which was received in evidence as plaintiff's Exhibit 10. The EIA standards are admittedly the "bible" of the industry. There are other specifications utilized by the military.

Mr. Rogers testified at some length as to the minimal tests required by the EIA standards and related them to the steps set forth in plaintiff's Exhibit 5.

The witness defined a capacitor as an electronic device that is designed to receive, store and release electrical energy as an electric charge. Mr. Rogers was of the opinion that the definition of a capacitor as being a device consisting of two electrodes separated by a dielectric is too general since it would apply to many things that are not capacitors. In a mica capacitor the dielectric material is mica and the electrodes are silver. Plaintiff's Exhibit 11, a 500 OHM T.V. antenna cable, consists of two electrodes separated by a dielectric but is admittedly not a capacitor. Likewise a romex cable used to carry electric housing current also consists of an electrode separated by a dielectric, but admittedly is not a capacitor.

The witnesses for plaintiff, as well as defendant, indicated that the silvered mica plates in their imported condition are never used in the trade as capacitors in an electronic circuit. Mr. Rogers asserted that in its imported condition the silvered mica plates are mere material for use in the manufacture of capacitors. The witness testified that in the manufacturing process in the United States there are twelve materials or parts utilized while only silver and

mica are used in the manufacture of the imported merchandise.

Mr. Rogers further testified the imported silvered mica plate is not a capacitor since it has no use or function and would not be recognized in the trade as a capacitor. The capacitance of a capacitor is governed by the quality of the dielectric and the size and number of dielectric distribution and electrodes. In order to obtain the desired capacitance, according to the witness, the plates are stacked in a parallel fashion. The definition of the term capacitor read to the witness from *McGraw-Hill Encyclopedia of Science and Technology* did not describe the imported silvered mica plates since the imported merchandise cannot function as a capacitor without performing the manufacturing operations set forth in Exhibit 5.

On cross-examination the witness testified an unfinished capacitor did not exist until Step 15 or 16 of Exhibit 5. It is not a capacitor, according to the witness, since prior to that point it has no environmental protection, protective sealants, or capacitance rating.

Plaintiff thereafter called Mr. Laird L. Macomber, senior product planner at AT & T Technologies. Mr. Macomber formerly worked at Hewlett-Packard for approximately four and one-half years as a technical publication engineer. For approximately eight years prior to that the witness held positions as an application engineer, first at Mallory Capacity Company and later with Cornell-Dubilier Company, in both instances dealing with capacitors. For approximately six and one-half years the witness was employed by C.T.S. Micro Electronics, a manufacturer of micro-circuits, utilizing capacitors.

Mr. Macomber defined a capacitor as a commercial electronic component used for the purpose of putting capacitance in an electrical circuit. It must have as minimum requirements, a known capacitance, terminals for attachment to a circuit, and be suitably mechanically enclosed in order to perform its function. Capacitance, according to the witness, is an electrical unit which measures the ability of a device to store electrical energy. The minimal requirements for commercial application of a mica capacitor are: (a) a known capacitance, (b) a rated voltage, (c) leads or terminals, (d) a suitable case or enclosure to make it mechanically rugged and sound.

Mr. Macomber testified the silvered mica plates are not capacitors since they lack the essential elements referred to *supra*. It was his opinion that an unfinished capacitor would not exist until Step 16 of plaintiff's Exhibit 5 since it is the first step at which leads for connecting into a circuit are provided and there is some measure of electrical utility present. In addition to the foregoing requirements, Mr. Macomber further indicated that it was necessary to have a tolerance rating for a salable capacitor.

Plaintiff's witness, Mr. Ray Holliday, is presently employed as division controller of Sangamo Capacitor Division. Prior to this employment, he was the chief financial accountant for plaintiff. His duties included the maintenance of books and records of Sangamo and includes familiarity with the purchase of imported silvered mica plates from India. The witness identified plaintiff's Exhibit 13 as a document depicting the manufacturing costs of mica capacitors at the Sangamo plant in South Carolina. The exhibit includes material and labor and overhead necessary for the manufacture of the mica capacitors. This information is determined on a standard cost system which may vary from the actual cost by no more than eight-tenths of one percent. According to Mr. Holliday the cost of the imported silvered mica plates is 2 percent for D–10, 3.7 percent for D–15, 25.1 percent for D–19, and 52 percent for D–30.

Defendant called Mr. Michael Trubowitsch, marketing manager for AVX Corporation, a leading manufacturer of multilayer ceramic capacitors. This company does not manufacture mica capacitors. Prior to his present employment, the witness was associated with various other manufacturers of capacitors. Those companies manufacture tantalum capacitors, dry electrolyte

capacitors, wet aluminum electrolytic capacitors, ceramic capacitors and various plastic film capacitors. Mr. Trubowitsch's employment did not relate directly to the production of capacitors, and he has never sold mica capacitors.

The witness, upon examining Exhibits 1 through 4, characterizes them as a capacitor array. The witness identified Exhibit G as a capacitor array made of ceramic material by the AVX Corporation. Mr. Trubowitsch testified that articles such as Exhibit G are attached into an electric circuit using various methods. While the witness was of the opinion Exhibits 1 through 4 could be similarly attached, he has never seen them so used, nor was he absolutely certain they would be able to accept soldering.

Mr. Trubowitsch testified that a capacitor, by definition, consists of two electrodes separated by a dielectric. He subsequently conceded the above definition should also include, by design, the introduction of capacitance into an electric circuit and that the basic definition is too encompassing. The witness agreed that the involved multilayer mica capacitors, as depicted by Exhibit 5, are designed by the manufacturer to utilize foil, clips and leads as the method to introduce capacitance to the electronic circuit. The witness further testified that the molded and dipped mica capacitor is designed to be encapsulated and have leads which are recognized requirements by the industry of such a component. The witness was unaware of any such article produced commercially without encapsulation and leads. It was the opinion of the witness that a mica capacitor produced from the imported silvered mica plates did not come into being until Step 15 of Exhibit 5. Mr. Trubowitsch knew of no trade standard for a single layered mica plate.

Based upon the record as made and the classification herein, defendant contends the imported silvered mica plates are capacitors or, in the alternative, unfinished capacitors within the meaning of General Interpretative Rule 10(h). The issue thus presented is whether the imported merchandise falls within the above or consists of mere material for the manufacture of capacitors as contended by plaintiff.

■ In the field of customs jurisprudence, a tariff term is construed in accordance with its common meaning, which is presumed to be the same as its commercial meaning. *Nippon Kogaku (U.S.A.), Inc. v. United States*, 69 CCPA 89, 673 F.2d 380 (1982). Congress is presumed to know the language of commerce, and to have framed the statutory provisions according to the general usage and denomination of the trade. *Nylos Trading Company v. United States*, 37 CCPA 71, C.A.D. 422 (1949).

■ The common meaning of a tariff term is not a question of fact but a question of law. *United States v. National Carloading Corp., et al.*, 48 CCPA 70, C.A.D. 767 (1961); *American Express Company v. United States*, 39 CCPA 8, C.A.D. 456 (1951). The determination of common meaning is a matter of judicial knowledge. The Court may and does consult dictionaries, lexicographic information, scientific information and other reliable sources of information as an aid to their knowledge. *United States v. Standard Surplus Sales, Inc.*, 69 CCPA 34, 667 F.2d 1011 (1981). The testimony of witnesses may be considered as an aid to the memory of the Court but is not binding and may be accepted or rejected. *Tropical Craft Corp. v. United States*, 45 CCPA 59, C.A.D. 673 (1958).

The parties have cited various definitions, including the following:

The *IEEE Standard Dictionary of Electrical and Electronic Terms* (1972):

*Capacitor (condenser).* A device consisting of two electrodes separated by a dielectric, which may be air, for introducing capacitance into an electric circuit.

*McGraw-Hill Encyclopedia of Science and Technology (1982):*

*Capacitor.* A device for introducing capacitance into a circuit. In general, a capacitor consists of two metal plates insulated from each other by a dielectric . . .

*Mica types.* These capacitors use thin rectangular sheets of mica as the dielectric. The dielectric constant of mica is in the range of 6–8. The electrodes are either thin sheets of metal foil stacked alternately with the mica sheets, or thin deposits of silver applied directly to the surface of the mica sheets. Mica capacitors are used chiefly in radio-frequency applications....

The classification of ceramic capacitors was before this Court in *Sprague Electric Co., et al. v. United States, et al.,* 65 Cust.Ct. 135, C.D. 3972 (1970), wherein the Court quoted the following language from heading 85.18 of the Brussels Nomenclature, which it noted was identical to the language of Item 685.80, *supra:*

Electrical capacitors (or condensers) consist in principle of two conducting surfaces separated by an insulating material (dielectric), e.g., air, paper, mica, oil, resins, ceramics or glass.

They are used for various purposes in many branches of the electrical industry (e.g.:—to improve the power factor of A.C. circuits; to protect electrical contacts from the effects of arcing; for storing and releasing given quantities of electricity; in oscilating circuits; in frequency filters; and very largely in the radio, television and telephone industries).

Their characteristics (shape, size, capacitance, nature of dielectric, etc.) vary according to their intended use. The heading, however, covers all capacitors whatever their intended use (including standard capacitors used in laboratories, specially made within fine limits and designed to remain constant during use).

 The definitions *supra* and the testimony establish a capacitor to be used in electronic circuits for the purpose of introducing capacitance. The components of a capacitor are two electrodes separated by a dielectric. However, it appears the design and the intended purpose are important. Hence any article having two electrodes separated by a dielectric does not necessarily make a capacitor. This is apparent by the examples offered as Defendant's Exhibit H and Plaintiff's Exhibits 11 and 12. Defendant's Exhibit H and Plaintiff's Exhibit 11 consist of T.V. antenna wire, and Plaintiff's Exhibit 12 is a piece of Romex house wire cable. These articles have the basic components of the definition and in fact may induce certain capacitance, but they are not designed, intended nor considered a capacitor by the trade.

According to the record the imported silvered mica plates are designed to be used in the manufacture of multilayered dipped capacitors with leads. They are never used for any other purpose and are not sold to the trade in their imported condition. The Electronic Industrial Association Standards, Plaintiff's Exhibit 10, is recognized by the industry. These standards require mica capacitors to meet the specifications established by the association. The merchandise in its condition as imported is not susceptible to most of the tests and, accordingly, would not meet the EIA standards.

In *Sprague, supra,* the Court made the following observation, which is also applicable to the imported merchandise:

Wire leads are then attached to the silvered disc to enable it to be utilized in electronic circuits. A resin is then applied to the body of the capacitor. Prior to the addition of the leads, the ceramic discs or silver ceramic discs are not electrical articles.

 In view of the foregoing, it has been established to the satisfaction of the Court that the imported silvered mica plates are neither designed nor capable in their condition as imported to be utilized in electrical circuits. It is also apparent that said merchandise is neither designed nor capable of introducing a known capacitance into an electric circuit. Accordingly, the Court finds the imported silvered mica plates are not capacitors.

The question as to whether they are unfinished capacitors is also answered in the negative for the reasons hereinafter set forth. The leading case, *Daisy-Heddon, Div. Victor Comptometer Corp. v. United States,* 66 CCPA 97, C.A.D. 1228, 600 F.2d

799 (1979) made the following observation and set forth five factors to be considered in determining whether an article is substantially complete and, therefore, unfinished:

There are several factors which may come into play in the determination of whether an article is substantially complete. In a case, such as this, where the article is incomplete due to the omission of one or more parts, as opposed to where an article is incomplete because the material which comprises the article is in need of further processing, the following factors can be relevant: (1) Comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recognize the importation as an unfinished article or as merely a part of that article. This list of factors is not exhaustive; it must be recognized that fewer than all of the above factors, or additional factors, may come into play depending on the particular importation. The outcome of each case will always depend on the particular merchandise involved.

Plaintiff's Exhibit 5, which sets forth the additional steps and materials added to the imported silvered mica plates to make a commercially acceptable capacitor, clearly establishes the subject merchandise does not fall within the unfinished category provided for in Rule 10(h), *supra*. It has been established that twenty-nine additional steps, plus packing, are utilized and twelve materials or parts are added. In addition Exhibit 13 establishes the cost of the imported merchandise for the finished capacitors, which is 2 percent, 3.7 percent, 25.1 percent and 52.0 percent for the D–10, D–15, D–19 and D–30, respectively. Each of the steps set forth on Plaintiff's Exhibit 5 are necessary for the completion of an article which will meet the industry standard as set forth in Plaintiff's Exhibit 10.

Defendant's reliance upon *General Electric Co. v. United States*, 2 CIT 84, 525 F.Supp. 1244 (1981), aff'd 69 CCPA 106, 681 F.2d 785 (1982) is misplaced. The omission of the power cord, transformer and internal connective wiring and loudspeakers is not analagous to the omission of the leads and the additional required steps set forth in Plaintiff's Exhibit 5. The added fabrication in the case at bar relates directly to the functioning of the capacitor, while in the *General Electric* case the added prefabricated components related to the stereo system as a whole and not the receiver per se.

■ The imported silvered mica plates are, therefore, not unfinished capacitors within Rule 10(h). However, for plaintiff to be entitled to receive duty-free treatment under the Generalized System of Preferences, as set forth in General Headnote 3(c)(ii), the cost of processing performed in the beneficiary developing country is required to be not less than 35 percent of the appraised value. The Secretary of the Treasury was authorized to promulgate regulations effectuating the headnote.

In the case at bar plaintiff filed Form A upon entry which indicates that not less than 35 percent of the cost of processing were incurred in India. 19 C.F.R. 10.-173(a)(4) permits customs officials to request further information as they deem necessary. Customs did not request such additional information, hence the information contained on Form A remains uncontradicted. In *House of Ideas, Inc. v. United States*, 2 CIT 68 (1981), the Court held that Form A, submitted upon entry and certified by an independent governmental authority of the exporting country designated by Customs for that purpose, is deemed to be presumptively correct.

■ Since plaintiff claims the imported merchandise to be dutiable in chief value of silver or mica, depending upon its content, it has the burden of proof to establish the component material in chief value.

In order to determine the component material in chief value, the case law holds the value of each component must be ascertained at a time when they have reached such condition that nothing remains to be done to them except to be combined. *Seeberger v. Hardy*, 150 U.S. 420, 14 S.Ct. 170, 37 L.Ed. 1129 (1893); *United States v. Jovita Perez, et al.*, 44 CCPA 35, C.A.D. 633 (1957). The affidavit of Mr. M.K. Pillai, the Director and Secretary of J.V. Electronics Ltd. the supplier, Plaintiff's Exhibit 14, specifically sets forth the values from the books and records of the company at the time of manufacture when nothing remains to be done but the joinder of the components. Based upon this evidence which stands uncontroverted, it is established that the silvered mica plates in frame sizes D–10 and D–19 are in chief value of mica and frame sizes D–15 and D–30 are in chief value of silver.

In view of the foregoing the imported silvered mica plates are not capacitors nor unfinished capacitors. The D–10 and D–19 frames sizes are articles of mica subject to classification under Item A516.94 and frame sizes D–15 and D–30 are articles of silver under Item A656.15.

Judgment will be issued accordingly.